**TUNGSTEN MINING CORPORATION,**
**Plaintiff,**

v.

**DISTRICT 50, UNITED MINE WORK-ERS OF AMERICA, Defendant.**

Civ. No. 742.

United States District Court
E. D. North Carolina,
Raleigh Division.

June 28, 1956.

Reade, Fuller, Newsom & Graham, Durham, N. C., Gholson & Gholson, Henderson, N. C., for plaintiff.

Armistead Maupin, Arendell & Green, Raleigh, N. C., for defendant.

GILLIAM, District Judge.

I heard the evidence in this civil action without a jury. The plaintiff's prayer for judgment grew out of a strike of the employees of the plaintiff at its tungsten mine and processing mill located in Vance County, North Carolina. What follows is a chronological summary of the pertinent events, as I find them from the evidence.

Tungsten Mining Corporation, referred to as "Tungsten", and United Stone & Allied Products Workers of America, C.I.O., referred to as "Stone Workers", after an election, entered into a collective bargaining agreement on April 3, 1946. Stone Workers was certified by the National Labor Relations Board as the collective bargaining representative of the employees of Tungsten. Contracts between Tungsten and Stone Workers were always in force from May 15, 1946, until January 15, 1953. Tungsten and Stone Workers changed the anniversary date to January during the interim to have it approximately coincide with the calendar year for their mutual convenience.

William Holleman and many of his fellow workers had become dissatisfied with the representation afforded them by Stone Workers. In October, 1952, Holleman contacted Frank Lumpkin, a relative, of Hopewell, Virginia, employed at the Hercules Powder Company; and the two discussed the process of changing unions. The union at Hercules Powder Company was District 50, United Mine Workers of America, the defendant before me, referred to as "District 50". Stortly after Holleman made this inquiry, W. A. Shuey, an officer of the Hercules Local, visited Tungsten, talked with Holleman, and supplied application cards for membership in District 50.

An organizing campaign launched by Holleman proved to be a success. In short order, 386 of Tungsten's approximately 400 employees signed up with District 50. Of these 386, 269 who had been members of Stone Workers also signed forms to sever relations with that union and cancel their dues checkoff authorization held by the Company.

About the middle of October, 1952, Robert Fohl, Regional Director for the United Mine Workers; Lucian Wood, Field Representative for District 50; and Shuey came to Tungsten and con-

ferred with James R. Sweet, Vice President and General Manager of Tungsten. The District 50 representatives informed Sweet of their union's majority status at Tungsten. They explained to him that union's avoidance of the National Labor Relations Board's facilities and offered to have District 50's status verified through the medium of some other disinterested third party. Local ministers and the North Carolina Department of Labor were suggested. There was, of course, no offer or request for the membership lists to be handed over directly to Tungsten.

A few days later, J. D. Foreman, a national representative of Stone Workers, arrived on the scene. He came in the capacity of Administrator of the Tungsten Local, having been appointed by Sam Scott, President of Stone Workers International, under a clause in the Stone Workers' constitution that provides for such an appointment in the event that a crisis is found to exist in a local. Foreman quickly lost any doubts he may have held as to the existence of a crisis. At a meeting of the majority of Tungsten's employees he was shouted down without a chance to make himself heard. Inquiry among the workers convinced him that virtually all had joined District 50, and he so informed the Company.

On November 13, 1952, George Pendley, Secretary of Stone Workers Local, sent to Tungsten a letter advising that the contract with Stone Workers, due to expire January 15, 1953, should not be renewed. Copies were sent to Stone Workers and the National Labor Relations Board.

W. L. Long, Vice President and General Counsel of Tungsten, and Sweet were uncertain what course Tungsten should follow in the situation that confronted them. In particular, they were puzzled by Foreman's claimed power to act for the Stone Workers. Long and Sweet attended a company meeting in New York in December. It was arranged for them to confer while there with an attorney for the Stone Workers from Boston. Foreman and Scott were also present at this conference.

Long and Sweet were readily convinced of Foreman's capacity to act for the Stone Workers Local in negotiating with Tungsten. Whether or not substantial agreement was reached there about a new contract is not at all clear from the evidence. Each of those present who testified before me had his own version of what was said and done in that New York hotel room more than three years before the trial. Regardless of where the negotiations were had, Tungsten and Stone Workers did enter into a new contract a few days later.

Through December and the early days of January, 1953, District 50 meetings and organization continued. Tungsten made no effort whatsoever to accurately evaluate the obvious situation of which it had full and ample notice. Before and during the strike Tungsten steadfastly refused to even consider that the Stone Workers Local was a defunct organization. Instead, by the testimony of its officers, Tungsten placed its reliance on three principal factors: (1) Advice from the N.L.R.B., which was completely out of touch with the situation; (2) Between 250 and 270 dues checkoff authorizations that it still held; (3) Stone Workers' N.L.R.B. Certification, which was more than six and one-half years old. Long, as General Counsel of Tungsten, was (and still is) of the opinion that Tungsten should refuse to bargain with any union not certified by the N.L.R.B.

On January 9, 1953, the storm broke. Holleman, who was then President of the unrecognized District 50 Local, was working in the mine with James Knight, Secretary of the new organization. The two were doing carpentry work in an overhand stope. About 11:30 A.M., it became necessary for them to descend to the tunnel beneath to cut a piece of lumber for their work in the stope. This done, they proceeded to eat their lunch before the regulation noon lunch hour. The assistant mine foreman and the shaft boss arrived. Holleman and Knight were fired on the spot.

They left the premises and began to meet employees on the next shift, and word of their discharge spread. By early evening a full-fledged strike was in progress. The days that followed were characterized by large scale confusion about the gates to the mine and the surrounding countryside. The confusion was attended by violence and rowdyism. On January 14, an order from the North Carolina Superior Court limited the number of pickets about the gate to six and forbade others from approaching within a hundred feet. A defendant named in that court order was District 50.

Fohl and Wood were about the scene of the strike frequently before the restraining order was issued which named their organization as a defendant. When these District 50 representatives learned that Holleman and Knight had been fired, they advised the two to present their grievance to Tungsten under the Stone Workers' contractual procedure. Holleman and Knight declined to do so, insisting that such a move would be futile. Wood was present on the night of the fourteenth when the restraining order was served. He assisted a Highway Patrolman in stepping off the one hundred feet specified in the order.

On January 15, 1953, Tungsten's old contract with Stone Workers expired, and District 50 formally adopted the six day old strike for the purpose of getting recognition. Strike headquarters was established at a rented building some distance from the mine. The union furnished picket signs demanding recognition. At all times, before and after the fifteenth, District 50 representatives cautioned strikers against violence. A federal injunction was issued by this Court on February 3, 1953, at which time the strike ended and representatives of District 50 sent copies of the injunction to all on strike, posted notices of it, and left the scene for good.

Tungsten's action against District 50 is founded on Title 29 U.S.C.A. § 187. The pertinent sections of that statute read as follows: "(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is —* * * (3) *forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of Section 159 of this title:* * * * (b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of Section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

The language italicized above is found also in Section 158(b) (4) (C). In this section the action defined in the repeated language is proscribed as an unfair labor practice for which an injunction is the appropriate remedy. Interpretations of this key language in the context of Section 158 are persuasive for determining the meaning in the context of Section 187. Such an interpretation was recently made in Ralph E. Kennedy, Regional Director of the Fourteenth Region of the National Labor Relations Board v. Warehouse & Distribution Workers Union, Local 688, 29 C.C.H. Labor Cases 69736 (D.C.Mo., 1956). The facts of this case are readily seen to present a striking parallel to those of the case at bar.

Following an election by secret ballot, Coca-Cola Bottling Company Salesmen Association (herein called Association) was duly certified as the exclusive bargaining representative of the employees

of Coca-Cola Bottling Company of St. Louis, Missouri (herein called Coca-Cola). A collective bargaining agreement was entered into between Association and Coca-Cola on July 17, 1953, providing for its expiration on November 1, 1955. Negotiations for a new contract were commenced in June, 1955, but none was agreed upon.

On September 2, 1955, respondent Warehouse & Distribution Workers Union, Local 688 (A.F.L.), (herein called Local 688), filed with National Labor Relations Board a petition for election of collective bargaining representative of the employees of Coca-Cola. Hearings on the petition were held. This procedure for recognition was closed to the defendant before me, District 50, because of its well-known refusal to bare its affairs to public scrutiny. However, in United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 565, the United States Supreme Court made it clear that the National Labor-Management Relations Act "does not make it a condition that the representative * * * shall be certified by the Board, or even be eligible for such certification." District 50 U.M.W.A. v. N.L.R.B., 4 Cir., 234 F.2d 565.

About October 25, 1955, while a decision on the petition was pending, Local 688 made demands on Coca-Cola for immediate recognition as the collective bargaining representative of the employees in the certified unit (Association) and that Coca-Cola negotiate a new agreement with Local 688, the latter union threatening to strike and picket Coca-Cola's premises to enforce its demands. Coca-Cola rejected such demands. All this occurred in the face of the certification of Association and before decertification.

Local 688 called the threatened strike on November 9, 1955, and the strike and picketing continued thereafter.

Association continued to function after October 24, 1955; Coca-Cola continued to deduct Association's membership dues from employees' wages and Association continued to accept the payments of such dues checked off; and Coca-Cola was at all times in possession of authorizations for check off of Association dues which had not been formally revoked in writing from about 173 of Coca-Cola's approximately 196 employees.

Judge Moore found two other important facts as follows:

"(a) Whatever may have been the membership of the employees, by October 24, 1955, the Association had clearly lost the support of a majority of the employees in the unit, and a majority had voluntarily designated Respondent as the agent they desired to be their collective bargaining representative. Respondent retained the voluntary allegiance of a majority of the employees in the unit until the trial in this case.

"(b) Before the time of the strike the Company, while it may not have been convinced that Respondent represented a majority of employees in the unit, had good cause to doubt, and did doubt, that the Association retained the support of a majority."

Upon the foregoing facts Judge Moore rendered his decision, based on these conclusions among others:

"Since the relief sought by petitioner is being denied on other grounds, it is not necessary to consider whether the Association's status, or its representation of the employees in the unit, had deteriorated to such an extent that the Association's certification should for this reason be regarded as totally ineffective.

"Because the Association had, by November 9, 1955, when the Association's certification was more than one year old, lost the support of a majority of the employees in the bargaining unit, and the Company had at least a bona fide doubt that the Association retained the support of a majority, the Company was then no longer required by law to bargain collectively with the Association, but was free to 'refuse to bargain further with it'. Brooks v. National Labor Relations Board, 348

t>

U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125. * * * An object of Respondent's conduct, therefore, was to require the Company to violate its duty of neutrality between the Association and Respondent * * * not to require the Company to violate its duty to bargain with the certified union.

"Section 8(b) (4) (C) of the act prescribes strikes 'having as their purpose forcing any employer to disregard his obligation to recognize and bargain with a certified union and in lieu thereof to bargain with or recognize another union'. * * * That section does not, as the Board contends, prescribe strikes directed toward compelling the employer to violate his duty of neutrality between two competing unions, nor does it prescribe strikes to gain an object (recognition) which could alternatively be gained, eventually, by means of the peaceful processes of the Board's election procedures, for it is not written in those terms, and there is no rational relation between these circumstances and the criterion established by the Act: whether 'another labor organization has been certified as the representative of (the) employees under the provisions of Section 9.' A strike is not rendered unlawful by the presence of such circumstances. * * * Accordingly Section 8(b) (4) (C) does not prescribe the conduct of Respondent in this case.

"The petition for an injunction should therefore be denied."

To my mind Judge Moore's opinion from which I have quoted at length is sound and, if followed, completely determinative of the case now before me.

██ The cases held that, while two unions are vying for recognition the employer is obligated by law to remain neutral, but, as pointed out in District 50 U.M.W.A. v. N.L.R.B. above cited, this does not "require that the employer refuse to recognize a bargaining agent chosen by a majority of his employees if such majority is so clearly established that there can be no true question with regard thereto." And also under the cases this right of the employer exists as a general rule where there has been a certification by the Board following an election, provided that one year has elapsed since the certification. Here, about six years had passed since the certification and I am of the opinion that Tungsten was at liberty to recognize District 50 upon clear proof that a majority of the employees was in January, 1953, committed to that union and had repudiated Stone Workers. This unquestionably was the situation and Tungsten was on notice. Tungsten really makes no attack on the large "sign up" which had been obtained by District 50 and there is no vestige of proof or even a suggestion that the signatures on the cards were not authentic. The record indicates that Tungsten had no hand in switching employees from Stone Workers to District 50. So that, it is my view that Tungsten was free to recognize District 50 in spite of the Board's certification of Stone Workers, but Tungsten preferred a contrary course, taking the position that it would recognize only a union certified by the N.L.R.B. Such position was without justification in law, as above pointed out.

██ Fairly considered, it seems to me, the action of defendant in adopting the strike, after the termination of the contract between Tungsten and Stone Workers, when in fact Stone Workers was no longer the choice of the employees as bargaining agent, should not be held to be in violation of the statute. No other avenue of relief was open to the defendant and the majority of the employees which it represented. Recourse to the Board was not available, but, as held in U.M.W.A. v. Arkansas Oak Flooring Co., above, and other cases, defendant was not precluded from representing employees as bargaining representative. It should not be held on the facts here that defendant's object was to force Tungsten to disregard its obligations to Stone Workers. The object was rather to lead Tungsten away from the generally prevailing obligation of neutrality where a real contest between two unions

is on, to cause it to act in the light of realities, to get Tungsten to realize and accept the fact that it was at that time under no obligation to Stone Workers, which was no longer the bargaining agent "designated or selected for the purpose ·of collective bargaining by the majority of the employees."

I am adjudging that District 50 is not liable to Tungsten because Stone Workers, despite its certification, was no longer a going concern, nor did it represent the overwhelming majority of Tungsten's employees—a situation of which Tungsten had every reason to be well aware. In view of this holding, it is unnecessary to discuss or decide the question of agency under Title 29 U.S. C.A. § 185, or the question of liability for wildcat strikes that are adopted by a defendant union.

In accord with the foregoing opinion, it is hereby ordered, adjudged, and decreed that the plaintiff Tungsten Mining Corporation recover nothing of the defendant District 50, United Mine Workers of America by this action. It is further ordered that the defendant recover of the plaintiff the defendant's costs incurred in the defense of this action.