**CONE BROTHERS CONTRACTING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15830.

United States Court of Appeals
Fifth Circuit.

June 22, 1956.

Rehearing Denied July 20, 1956.

Ralph C. Dell, Le Roy Allen, Tampa, Fla., Reeves, Allen & Dell, Tampa, Fla., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, NLRB, David P. Findling, Assoc. Gen. Counsel, Frederick U. Reel, Atty., Washington, D. C., Theophil C. Kammholz, Gen. Counsel, Washington, D. C., for respondent.

Before RIVES, CAMERON and JOHN R. BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

In the Employer's petition for review of the findings[1] and Order[2] of the Board, the principal attack, deferred of necessity to this time, Volney Felt Mills, Inc., v. LeBus, 5 Cir., 196 F.2d 497, is on the validity of the election proceedings leading to Certification by the Board, July 27, 1954, of United Stone and Allied Products Workers of America, CIO, as the Exclusive Bargaining Representative of all of the employees in the unit concerned.

The Employer attacks the certification on the ground that the eligibility date (February 27) ought not to have been the same for the original and run-off elections.[3] In support of this, it asserted, through proffered proof, that, by notable changes in personnel,[4] a substantial portion of the unit employees were denied

1. The Examiner's conclusions in the Report [111 NLRB No. 62] approved by the Board in full were summarized: "By refusing to bargain with the Union on request, unilaterally raising the wages of some of the employees in said unit, stating that it will close its doors before signing a contract with said Union, refusing to furnish the Union, on request job classification and wage data relevant to negotiations of wage and working conditions for the employees in the appropriate unit, and polling the employees concerning whether they are members of the Union, Respondent has engaged and is engaging in unfair labor practices within the meaning of Section 8(a) (5) and (1) of the Act [29 U.S.C.A. § 158(a) (1, 5)]."

2. The Board affirmed all of the rulings and adopted, "the findings, conclusions, and recommendations of the Trial Examiner" and ordered that the employer cease and desist from (a) refusing to bargain with the Union (b) refusing to furnish job classification, wage data, etc. (c) threatening to close its business (d) polling or interrogating its employees in such a manner as to interfere with, restrain, or coerce them in rights guaranteed by Section 7 of the Act (e) granting any wage increase or otherwise altering the terms or conditions of employment without prior notification and (f) "In any like or related manner interfering with, restraining or coercing its employees in the exercise of the right to self-organization, to form, join or assist, and bargain collectively through said Union * * *."

3. The original election was held March 17, 1954, the run-off April 7, with these results:

|  | March 17 Election | April 7 Run-Off |
| --- | --- | --- |
| United Stone and Allied Products Workers of America, CIO [referred to herein as "Union"] | 129 | 196 |
| No Union | 129 | 140 |
| International Union of Operating Engineers [called "Engineers"] | 77 | — |
| Ballots challenged or voided | 11 | 9 |
| Totals | 346 | 345 |

4. The Employer proferred testimony that between February 27, the eligibility date, and March 27, the eligibility date which it urged the Board to fix for the run-off, 87 employees had left its employ and 99 were hired. Under the Examiner's ruling that, in the Complaint Proceedings, he was bound by the prior action of the Board, there was no evidence received on this or on the number of those out of the 99 "new" employees who were actually employed on March 27.

the right to express their wishes and, as a corollary, the result might well have been different had they been allowed to vote. It was because of this that the Employer took the private poll,[5] condemned as an unfair labor practice by specific finding of the Board, and which, it further claimed, demonstrated that the eligibility date, artificial and too remote, resulted in an election not truly reflecting the will of the employees.

The assault is a frontal one for the Employer concedes—indeed, its complaint is founded on the fact—that in fixing the same eligibility date for both elections, the Board was following its formal rule,[6] reflecting, as it does, its long traditional practice.[7]

▮▮▮ We think that the action of the Board in following its rule and practice under the circumstances of this case was eminently fair and just, and the Employer has failed in its burden to establish the contrary, N. L. R. B. v. Huntsville Mfg. Co., 5 Cir., 203 F.2d 430, 433, 434; N. L. R. B. v. Bar-Brook Mfg. Company, Inc.,

5 Cir., 220 F.2d 832, 834. A single eligibility date, barring unique and pressing circumstances requiring a different rule, close in point of actual time to both elections is a reasonable and practicable adjustment in the election machinery to assure a free and just result by avoidance of the opportunity or temptation to manipulate the electorate through purposeful hirings or firings by either union or employer. Fixing eligibility at *some* time prior to the commencement of the vote in labor or political elections envisages that some individuals will be without a voice, but, "The principle of majority rule * * * does not foreclose practical adjustments designed to protect the election machinery from the ever-present dangers of abuse and fraud", N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330, 331, 67 S.Ct. 324, 328, 91 L.Ed. 322.

▮▮▮ This reflects a common and necessary practice in political elections where residence or advance registration requirements frequently result in partial disenfranchisement and, by a closer anal-

---

5. By proper steps in the Representation Proceedings, the Employer raised all of the present objections to the election, but the Board, in a Supplemental Decision and Certification, July 27, 1954, (109 NLRB 483) unanimously certified the Union as the Exclusive Bargaining Representative stating that, "Material deviation from the rule set forth in Section 102.62 * * * is not warranted and would not be consistent with good administration of the Act. Between July 27 and the first bargaining session held August 12, the employees were requested to mark a ballot accompanying pay checks which read:

" 'Do you belong to the United Stone and Allied Products Workers of America, CIO, Union?

(Please answer by checking 'Yes' or 'No')

[Yes: ]   [No: ]

" 'We are asking the above question simply to see whether the union represents a majority of you or not. Your truthful answer will be appreciated. It will make no difference whether you do or don't.' "

Of 470 "ballots", 64 answered "Yes" and 406 "No". Inarticulately drawn, as the Employer concedes, the significant

word was *belong*, a matter which confused some employees whose applications for membership had not been finally processed, and which was, in any case, irrelevant to *representation*.

6. 29 CFR 102.62: "Employees who were eligible to vote in the * * * [original] * * * election and who are employed in an eligible category on the date of the run-off election shall be eligible to vote in the run-off election."

7. Apparently first used as a rule of decision in 1939 in Aluminum Co. of America, 13 N.L.R.B. 79, 81, the rule was formally promulgated as early as 1943 in Section 11(b), Art. III, NLRB Rules and Regulations, Series 3, effective November 16, 1943; and is, the Board states, applied even-handedly against labor unions (see Standard Coil Products Co., 101 N.L.R.B. 261; Reed Roller Bit Co., 61 N.L.R.B. 867) as well as against employers (Jasper Wood Products Co., 75 N.L.R.B. 808) requesting a later eligibility date, while recognizing, of course, the necessity for a new eligibility date where, for some reason, the original election is vacated, e. g., for irregularity or misconduct, see McMullen Leavens Company, 83 N.L.R.B. 948, 955.

ogy, primary nomination elections[8] in which, as under this Act,[9] the run-off is a part of the original election and is but a further step [10] in that proceeding.

▮ An original election within three weeks of the eligibility date, followed by a run-off three weeks later, with the eligibility date for both fixed by impartial application of the long-time rule was not arbitrary, unreasonable action by the Board to whom, "Congress entrusted * * * the control of the election proceedings and the determination of the steps necessary to conduct an election * * *". N. L. R. B. v. Huntsville Manufacturing Company, supra [203 F. 2d 434].

▮ Since the Employer, deeming the certification invalid, declined altogether to bargain in good faith, this ultimate rejection by us of the claim of invalidity of the certification, automatically affirms the Board's basic finding of a violation and requires enforcement of the affirmative order to bargain.

▮ The refusal to bargain was asserted in the genuine belief that the election was invalid, but, as we have held, this mistaken belief does not, cannot, excuse the Employer from the consequences of this basic violation of the Act. But we do not think that the bargaining procedure which must now commence should be encumbered, advantages or disadvantages be gained or suffered, by the lurking threat of contempt proceedings based on one or more of the specific, incidental, subsidiary, detailed provisions of the cease and desist order which have no real substantial support in the record. This is especially so because of the sweeping prohibition (Item (f) note 2, supra) against "like or related" interferences with employees' rights.

▮ Several are extremely inconsequential and have a standing as a specific complaint only through extraordinary technicality: the refusal (Item (b) note 2) to furnish job classification, wage data, etc., was not an obdurate unwillingness to afford needed information to embarrass or retard the effectiveness of the bargaining process of the type condemned in N. L. R. B. v. Item Company, 5 Cir., 220 F.2d 956; if it were ever declined as such, it was inferential only when, because of the basic complaint about certification, the Employer declined to bargain at all. The finding (Item (c) note 2) of threatening to close its business comes down to a single outburst by a vice president described by the Examiner as, "a declaration * * * made in a moment of deep emotional disturbance over an ultimatum he received from another union [the Engineers—the rival union which lost in the first election], that he would close the business before he would sign a contract * * *" and concerning which the Board later stated, "in these circumstances, it is a fair conclusion that neither Conrad nor Lynn [the only two employees who were ever shown to have heard this conversation] regarded * * * [the vice president's] statement as a threat; nor, if the incident had ended there, could it validly be said to have tended to restrain or coerce either them or any employee who might later have learned of the incident." The granting of wage increases (Item (e) note 2) was an unsolicited raise of ten cents per hour to all truck drivers of heavy equipment who had been

8. The Board's rule is in harmony with the policy of Florida, the situs of the Employer, which closes registration books 30 days before the first primary and thus fixes eligibility for the run-off, held three weeks later, to those originally eligible, Florida Statutes Annotated, Election Code of 1951, §§ 97.031, 98.011, 98.051, 100.061, 100.091.

9. Section 9(c) (3) provides in part: "In any election where none of the choices

on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election."

10. See Aluminum Co. of America, supra; Sears, Roebuck & Co., 48 N.L.R.B. 1170, 1173.

in the Employer's employ for a year or more, given on August 28 during the period that the three bargaining sessions were being held. Attempting now to compress this into a situation like N. L. R. B. v. Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320; Armstrong Cork Mfg. Co. v. N. L. R. B., 5 Cir., 211 F.2d 843, the Report significantly stated, "the Examiner does not find that the raise was given with destruction of the Union's majority as its premediated goal. It was granted to but a part of the group, who had not participated in an earlier raise * * *; those receiving it were persons of proven competence * * * [and] * * * While the wage raise thus overstepped the bounds of Section 8(a) (5) * * * the factors pointing to a business necessity for granting the raise puts the matter of actual motive in sufficient doubt for Respondent to be entitled to the benefits thereof."

Nor, on final analysis, do we think there is anything in the record which would support the finding that the poll (Item (d) note 2) was meant to, or did, have the effect of interfering with the employees' rights under the Act. While we adhere to the notion that an employer may lawfully discuss the subject of their union preferences with employees, see N. L. R. B. v. McGahey, 5 Cir., 233 F.2d

406, we do not think that this is the case in which to determine when, or under what circumstances generally, a poll may be taken.[11]

Here the poll, voluntary and with no compulsion, was to resolve in the Employer's mind the doubt so deep concerning the validity of the election process as to lead it to take the forthright, albeit risky, course of declining to bargain as the means of testing its convictions. The Board, while agreeing[12] with this, concluded, after an extended seventeen-page discussion, that the effect of the poll was either an attempt to repudiate the official election or so undermine the prestige, standing or integrity of the Bargaining Representatives as to embarrass the effectiveness of negotiations, that it was itself an unfair labor practice. But the unfair labor practice was not the taking, or the use of the results of, the poll which, as the Employer saw it, merely confirmed its contention (legal and factual) that the Board's election was invalid and did not reflect the true wishes of its employees. The unfair labor practice was the outright, final refusal to bargain under the genuine, though mistaken, idea that this was its legal right. This was a calculated risk which it took apparently with full consciousness of the consequences if it were wrong. But in doing this, the Employer

---

11. Some cases appear to hold that a systematic inquiry is an invasion of the employee rights: N.L.R.B. v. Wm. Tehel Bottling Co., 8 Cir., 129 F.2d 250, 252–253; N.L.R.B. v. Colten, 6 Cir., 105 F.2d 179, 181–192; N.L.R.B. v. Burry Biscuit Corp., 7 Cir., 123 F.2d 540, 541–543; Titan Metal Mfg. Co. v. N.L.R.B. 3 Cir., 106 F.2d 254, 260, certiorari denied 308 U.S. 615, 60 S.Ct. 260, 84 L. Ed. 514; N.L.R.B. v. Somerville Buick, 1 Cir., 194 F.2d 56, 58.

Others recognize their legitimate use: N.L.R.B. v. Russell Kingston, 6 Cir., 172 F.2d 771, 774; Katz Drug Co. v. N.L.R.B., 8 Cir., 207 F.2d 168, 171–172; N.L.R.B. v. Protein Blenders, 8 Cir., 215 F.2d 749, 750; N.L.R.B. v. Roberts Bros. 9 Cir., 225 F.2d 58.

12. The Board's Report states: "The Examiner is persuaded that Respondent's purpose in taking that poll was not to obtain disclosure of the affiliation of any individual employee, but for such reasons as seemed sufficient to it, Respondent wished to make a tally of its own concerning the unit as a whole. While, as the Examiner finds, the poll was not borne of any desire to obtain discovery of individual preferences or to punish any employee, still open and deferred to the conclusionary part of this report is the question of whether the poll, considering its occasion * * * impinged upon the rights guaranteed * * * in * * the Act * * *."

The "conclusionary" part of the Report referred to above began with this basic finding: "The poll of the employees, as has already been found, was not resorted to for the purpose of either making discovery of the individual union preferences or affiliations of the employees or laying a basis of reprisal therefor."

anticipated, as came to pass, that the soundness of its claim of illegality would be determined in the inevitable (and present) Complaint Proceeding and not by self-help which would be condemned, Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125; N. L. R. B. v. Sanson Hosiery Mills, 5 Cir., 195 F.2d 350, certiorari denied 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669, whether by the *device of a private poll or otherwise.*

The Board's Order is sustained insofar as it requires Petitioner, the Employer, to bargain collectively with United Stone and Allied Products Workers of America, CIO, as the duly certified exclusive Bargaining Representative of its employees in the certified unit, but enforcement as to the balance (Items (b), (c), (d), (e) and (f), note 2) is denied, and the Employer's Petition, to that extent, is sustained.

Enforcement granted in part and denied in part.