243 F.2d 284
 John L. PARKS, d/b/a American Box and Paper Company, Appellant,
v.
ATLANTA PRINTING PRESSMEN AND ASSISTANT'S UNION NO. 8, INTERNATIONAL PRINTING PRESSMEN AND ASSISTANT'S UNION OF NORTH AMERICA, A.F.L., Appellee.
 No. 16257.
 United States Court of Appeals Fifth Circuit.
 April 5, 1957.
 Writ of Certiorari Denied June 24, 1957.
 
 See 77 S.Ct. 1397.
 Hoke Smith, George B. Haley, Jr., Atlanta, Ga., Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Ga., of counsel, for appellant.
 John S. McLellan, Kingsport, Tenn., Robert L. Mitchell, Atlanta, Ga., for appellee.
 Before RIVES, TUTTLE and BROWN, Circuit Judges.
 JOHN R. BROWN, Circuit Judge.
 
 
 1
 In 1953 the National Labor Relations Board, after an election Section 9(c) (1) (A), 29 U.S.C.A. § 159(c) (1) (A), certified that the specified CIO local was the exclusive bargaining agent for the identified unit[1] of the Employer's printing plant. On April 13, 1955, the defendant AFL Union, with no certification as representative of these or any other employees of this plant, struck the Employer's plant to force recognition.
 
 
 2
 A plain, literal violation both of Section 303(a) (3) and (b) authorizing recovery of damages by an employer[2] and Section 8(b) (4) (C), subjecting an offending labor organization to administrative sanctions of the Board for an Unfair Labor practice[3] was nonetheless declared to be permissible because the certified union, while certified, had not actively functioned as the bargaining representative for the unit and no longer in fact represented a majority of the unit members.[4] After some vacillation the District Court, treating pleadings, affidavits and stipulations and motions to dismiss and for judgment as motions for summary judgment, Fed.Rules Civ.Proc. 56 and 12(c), 28 U.S.C.A. denied the motion of the plaintiff employer and granted that of the defendant AFL union to dismiss the employer's suit for damages.
 
 
 3
 The certification, originally issued, is still outstanding and has never been cancelled, and no other labor organization has been certified for the employees in the specified unit. In February 1955 the rival AFL union filed a Petition for Election and Certification with the Regional Director of the Board to represent employees in a broader unit which would comprise 27 persons and include crafts in addition to those in the original certified unit. The Employer declined to recognize, meet or negotiate with the AFL union. At 10:00 a. m. April 13, 1955, the AFL union delivered an ultimatum that negotiations commence at 12:00 noon, or the employees would strike. The Employer refused and the plant was struck. Two weeks later, April 27, 1955, the AFL union formally requested, and the Regional Director granted, withdrawal of the previous request for an election of a new bargaining representative.
 
 
 4
 The Employer insists that with such simple, plain words, "* * * if another labor organization has been certified as the representative of such employees under the provisions of section 159 * * *," there is no room for reading into the Act, as would the raiding rival union, words requiring not only certification but that the certified union then currently represents a majority of the employees.
 
 
 5
 In the defendant union's approach, current majority status is decisive for, it argues, the Act protects the employer from the coercive pressures from a raiding union only if such employer, in an administrative Board proceedings, could have been compelled to bargain with the certified union. If, from an absence of a majority status, the employer could not have been found guilty of an unfair labor practice at the complaint of the certified union then pressures from the outside union are permissible since they do not seek to compel action by the Employer in disregard of his obligations to deal with the certified union. The result is that, following this approach, the application and meaning of words purposefully and recently put into the Act proscribing conduct by labor unions, as such, is to be measured and tested by routine application of the terms of Section 8(a) (5) which expressly applies only to employers,[5] not employees.
 
 
 6
 We reject any such narrow interpretation and construction as out of step with the plainly revealed Congressional purpose.
 
 
 7
 At the outset it is significant that Congress in Section 8(b) (4) and 303(a) (3) did not, as it might, speak in terms of a labor organization "designated or selected by a majority of the employees" or "then representing a majority of the employees", or one with whom the "employer is by law required to bargain collectively." Such descriptive standards, though capable of tangible delineation, would unavoidably present substantial questions of fact in application. This difficulty was eliminated altogether by using the precise standard of a union which has been "certified as the representative of such employees under the provisions of section 9 of the * * * Act." Legislative significance of the status as a "certified union" is, of course, acknowledged by the defendant union for it recognizes, as it must, that during the twelve months period subsequent to a post-election certification, the status as a certified union is alone decisive. Brooks v. N. L. R. B., 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125.
 
 
 8
 Referring, as it did, to certifications under Section 9, Congress must have intended to include not only the fact of initial certification but the statutory process of altering or terminating a certification. This, of course, specifically covers the exact situation where it is claimed that a certified union no longer represents a majority.[6]
 
 
 9
 Thus, this is not a case in which by judicial action we must fill an inadvertent legislative void. For here machinery is prescribed which fully meets initial and changing needs. Wherever and whenever, the policies of the Act would be infringed, thwarted, or impeded by continued recognition of a prior certification, a ready and workable means is at hand to rescind it. That machinery is simple and available and assures that if, as will generally be the case, there is dispute and controversy over the necessity and desirability of decertification and change, the facts can be surveyed and determined by the Board as a disinterested tribunal.
 
 
 10
 The criticism that the administrative discretion lodged in the Board in determining after an appropriate hearing that such "a question of representation exists" might result in a denial of an outside union's request proves, we think, the wisdom of our holding. If, on that hypothesis, the facts to the Board do not reasonably require decertification or an election to determine it, why should an employer under the pressures of a strike and threatened stoppage of its business operations, be compelled to submit to a demand which an impartial tribunal has thought unfounded?
 
 
 11
 Indeed, pursuing this analysis of the predicament of the Employer, demonstrates that Congress had definite purposes in mind in describing the union as "certified."
 
 
 12
 Underlying Sections 8(b) (4) and 303 (a) (3) is Congressional recognition that industrial peace and stability was not being achieved, that chaos and unrest frequently arose, where employers were put in the position of making a hard choice between rival forces, whether the competition was between certified and uncertified unions, between different crafts in jurisdictional disputes, or between a union and some other employer. A mere attitude of neutrality by the employer was neither sufficient nor helpful, for the success or failure of the controversy between the unions did not depend on one, rather than the other, obtaining the partisan help of the employer. Either way the employer turned, favoring one or the other, the unfavored would strike. And if, as is more likely, the employer stood helplessly by, the strike or the threat of a strike by whichever one was on the "outside" had as its purpose not employer neutrality but, finally employer partisanship — complete and absolute capitulation to the demands of the victor.
 
 
 13
 Moreover, a rule which would permit or require an employer under pressure of a strike or threatened one to bargain with a rival union claiming a current majority would compel, as a corollary, a duty by the employer fairly and honestly to investigate and determine the validity of such claim. And in this process what means does the employer have? What may he use? If he interrogates, how is he to do it? Singly or in groups? At what point does a conscientious effort to ascertain the real exact truth about his employees' wishes transcend legitimate inquiry and become the seed for an assertion of employer bias and then shift from rival union to employer the enveloping cloud of a charge of unfair labor practice?[7]
 
 
 14
 Must the employer take the first answer of interrogated employees, or may, or must, he probe deeper when circumstances indicate, as they easily might, that the apparent defection to the raiding rival is the very result of threats against their security or safety? And if invidious fear permeates the atmosphere, what facilities has the employer to ferret out the facts, obtain evidence, formal or informal, which would measure up to the minimum demands of an objective, trustworthy investigation? What protection, or assurances of it, can he give to reluctant or apprehensive employees? How can he compel those he knows know the truth to reveal what they know he knows they know? Where fear, or apprehension, or stubborn recalcitrance or defiance seal off access to the whole truth, must the employer, frustrated and thwarted in this unsought role of arbiter, nevertheless come to a decision? And through it all how can a dispassionate objective search for truth be made by one who, no matter how conscientious is his purpose fairly to investigate and determine, cannot escape the constant knowledge that, through actual or threatened strike by the raiding group, it is the economic security of his own business which is threatened or at stake?
 
 
 15
 This and further analysis demonstrates that to argue that because an employer in a complaint proceeding charging an 8(a) (5) unfair labor practice for failure to bargain in good faith, perhaps will not[8] be compelled ultimately to bargain with the certified union which has in fact lost its majority status after the passage of one year, such an employer will not be protected by administrative relief, § 8(b) (4) (C), or damages, § 303(a) (3), from a raiding union is "* * * to make situations that are different appear the same." Brooks v. National Labor Relations Board, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125, 134.
 
 
 16
 First, if the whole thing is equated with the employer's ultimate obligation to bargain, then the fact of certification in determining availability of the remedies of Sections 8(b) (4) (C) and 303 (a)(3) becomes virtually immaterial after the first year. Next, the very structure of the Act itself shows that where the protected union is one the employer is obligated to recognize and with whom it is required to bargain, very plain words conveying that clear meaning were used.[9] And the principal distinction is again the fundamental difference between determination of the controversy in a deliberative forum with its appeal to a reasoned, impartial consideration of reliable facts as opposed to decision wrought by the unleashing of native jungle forces of sheer economic power with the likelihood, if history is to be our guide, that where spirits are high and feelings deep, economic pressure may soon have physical power as an ally. If in Section 8(a) (5) unfair labor complaint proceeding the employer is ultimately absolved from bargaining with the certified union because it has lost its majority status, the decision is not that hammered out by clashing forces of unreasoning power, but is that of an independent tribunal functioning with adequate machinery established to resolve such very controversies. Adjudication, not self-help, deliberation, not display of pressure, has been the solvent. Cone Bros. Contracting Co. v. N. L. R. B., 5 Cir., 235 F.2d 37, certiorari denied 352 U.S. 916, 77 S.Ct. 214, 1 L.Ed.2d 122.
 
 
 17
 We therefore, as does the Fourth Circuit in its recent decision,[10] Tungsten Mining Corporation v. District 50, United Mine Workers of America, 242 F.2d 84, 88, hold that, in the words of the Act, the decisive thing is the certification by the Board. Until by Board action it is effectually extinguished, it has continued vitality to protect an employer against a raiding rival whose objective is "forcing or requiring [such] employer to recognize or bargain with * * * [it] * * * as the representative of [his] employees * * *."
 
 
 18
 The Order granting summary judgment for the defendant AFL Union is reversed and rendered for the plaintiff John L. Parks, d/b/a American Box and Paper Company, on the issue of liability and the cause is remanded for further and not inconsistent proceedings.
 
 
 19
 Reversed and rendered and remanded.
 
 
 
 Notes:
 
 
 [1]
 The unit was composed of "all lithographic department employees, including camera men, layout men, plate makers, lithographic pressmen, and their apprentices and helpers, and the artists employed at employer's plant in Atlanta, Georgia, excluding all other employees and supervisors as defined in the Act."
 
 
 [2]
 29 U.S.C.A. § 187:
 "(a) It shall be unlawful, * * * for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods * * * or to perform any services, where an object thereof is —
 * * * * *
 "(3) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
 * * * * *
 "(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States * * * and shall recover the damages by him sustained * * *."
 
 
 [3]
 29 U.S.C.A. § 158:
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods * * * or to perform any services, where an object thereof is:
 * * * * *
 "(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;"
 
 
 [4]
 It was undisputed that: seven men comprised the unit in 1953. No formal contract was obtained, but the certified union did secure a raise for the unit employees in late 1953. No demand by it for formal bargaining was made in 1954 or 1955, nor were any shop steward, grievance machinery or similar procedures installed. Apparently there was mutual inactivity in formal bargaining. At the time of the strike, April 13, 1955, there were five men working in the certified unit, two of whom, originally members of the CIO union, became members of the rival AFL union shortly before the strike
 
 
 [5]
 Section 8(a) (5), 29 U.S.C.A. § 158(a) (5):
 "(a) It shall be an unfair labor practice for an employer — * * *
 "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9(a)."
 
 
 [6]
 Section 9(c) (1), 29 U.S.C.A. § 159(c) (1):
 "Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board —
 "(A) by an employee or a group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees * * * (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in Section 9(a); * * *
 the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. * * * If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."
 
 
 [7]
 See, e. g., National Labor Relations Board v. Wagner Iron Works, 7 Cir., 220 F.2d 126, at page 139, certiorari denied 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850, "Thus, the Board has recently held that an employer may legally interrogate his employees as to their union membership in order to inform himself as to the validity of a union's claim of majority support. Blue Flash Express, Inc., 109 N.L.R.B. No. 85. However, as the Board said, the object of interrogation must be within the law and an employer acts at his peril, lest his investigation become tainted and coercive when considered in conjunction with other activities which reveal a departure from strict neutrality." National Labor Relations Board v. Nashua Manufacturing Corporation of Texas, 5 Cir., 218 F.2d 886; National Labor Relations Board v. McGahey, 5 Cir., 233 F.2d 406; National Labor Relations Board v. Montgomery Ward & Co., 2 Cir., 192 F.2d 160; National Labor Relations Board v. Coats & Clark, Inc., 5 Cir., 241 F.2d 556; National Labor Relations Board v. Fox Manufacturing Company, 5 Cir., 238 F.2d 211; National Labor Relations Board v. Newton Company, 5 Cir., 236 F.2d 438
 
 
 [8]
 Brooks v. N. L. R. B., 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125, 134, "The Board has ruled that one year after certification the employer can ask for an election or, if he has fair doubts about the union's continuing majority, he may refuse to bargain with it. This, too, is a matter appropriately determined by the Board's administrative authority." Appended to this text is note 18: "Celanese Corp. of America, 95 N.L.R.B. 664. The Board has on several occasions intimated that even after the certification year has passed, the better practice is for an employer with doubts to keep bargaining and petition the Board for a new election or other relief. Id. [95 N.L.R.B.], at 674; United States Gypsum Co., 90 N.L. R.B. 964, 966-968; see also J. P. O'Neil Lumber Co., 94 N.L.R.B. 1299."
 N. L. R. B. v. International Furniture Co., 5 Cir., 212 F.2d 431, 433; cf. N. L. R. B. v. Sanson Hosiery Mills, 5 Cir., 195 F.2d 350, certiorari denied 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669; N. L. R. B. v. White Construction & Engineering Co., 5 Cir., 204 F.2d 950, distinguishing N. L. R. B. v. Aldora Mills, 5 Cir., 197 F.2d 265.
 
 
 [9]
 See, e. g., 8(b) (4) (D), 29 U.S.C.A. § 158(b) (4) (D): "* * *Provided, That nothing contained in this subsection (b) [8(b)] shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act;" (emphasis supplied).
 Almost identical language is used in the damage suit sanction of § 303(a) (4), 29 U.S.C.A. § 187.
 
 
 [10]
 This case, reversing the District Court's holding, 142 F.Supp. 800, so heavily pressed by the defendant AFL Union, points up further difficulties of construing "certified" to require certificationplus a current majority. During the strike the same District Court had, on application of the Regional Director under Section 10(l), 29 U.S.C.A. § 160 (l), enjoined the raiding union from striking and picketing to force recognition of District 50 as the representative of employees for which the certified union had been certified. This ended the strike. Subsequently in an administrative proceeding, the National Labor Relations Board held, 106 N.L.R.B. 905, that the strike was illegal under Section 8(b) (4) (C) and issued its cease and desist order which, on Enforcement Proceedings, was affirmed, without opinion, by the Fourth Circuit.
 If the controversy may be thrashed out by a picket line where does it leave the parties and especially the by-standing employer if, after capitulation under the pressures of a strike, the Board, on substantial evidence determines in accordance with law that the certified union in fact had a current majority status and that the raid was illegal? Where does it leave the Board, indeed the Court of Appeals, whose orders may thus have been rendered lifeless?
 Kennedy v. Warehouse and District Workers Union Local 668, 29 CCH Labor Cases, No. 69736 (D.C.Mo.), also much relied upon was a denial of injunction, Section 10(l), 29 U.S.C.A. § 160 (l), although subsequently the Board, 116 N.L.R.B. 115, on the merits, determined that the strike was unlawful.