NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DAN RIVER MILLS, INCORPORATED, Alabama Division, Respondent.

No. 17693.

United States Court of Appeals
Fifth Circuit.
Jan. 26, 1960.

Fred S. Landess, Atty., Thomas J. Mc-Dermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Fannie M. Boyls, Atty., N. L. R. B., Washington, D. C., for petitioner.

Frank A. Constangy, Constangy & Prowell, M. A. Prowell, Mildred McClelland, Atlanta, Ga., for respondent.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Board seeks enforcement of its decision and order, 121 N. L. R. B. 82, holding that the Employer had violated § 8 (a) (1) by unlawful interference with protected rights, § 8(a) (3) by discriminatory discharge of five employees for union activities and § 8(a) (5) by bad faith refusal to recognize the union as bargaining agent in the Aliceville, Alabama mill. 29 U.S.C.A. § 158(a) (1), (3) & (5). We enforce in part.

The organizational activity at the Aliceville, Alabama mill began in early December 1956 and the events we deal with run into June 1957. The first union organizational meeting was held December 11, 1956, and on the following day two of the discharges here involved were made. By December 16 the Union claimed to have obtained authorization cards from a majority of the employees, and on that date, or a few days thereafter, notified the Employer and requested recognition. An election, originally ordered pursuant to representation proceedings and hearing, was never held as the Board

dismissed the petition because of the Union's amended charge and the Board complaint made thereon asserting a § 8 (a) (5) unfair labor practice for refusing to recognize the Union.

### § 8(a) (1) Violation.

 Little need be said about the Board's decision and the evidence on this score. The Employer does not concede the validity of the charge. Indeed, it asserts that the findings are strained and ought not to have been made. But it does expressly acknowledge with a candid and lawyer-like intellectual realism that takes into account the vivid delineation of responsibility between the Board and a reviewing court, N. L. R. B. v. Ferguson, 5 Cir., 1959, 257 F.2d 88, that on this phase the evidence was sharply conflicting and afforded the basis for contrary inferences by the fact finder.

This evidence which we need not detail amply justified the subsidiary conclusions adding up to unlawful interference. These included coercive interrogation of employees concerning union views and activity, threats to shut down the mill if the mill were organized, threats to discharge employees because of their union views and actions, surveillance of a Union meeting and the requirement that a discharged employee forsake union views as a condition to reemployment.

### The § 8(a) (3) Discharges.

 Of course, the violation of § 8(a) (1) does not bring all discharges made during its pendency within § 8(a) (3). N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F.2d 406, 410. A discharge becomes forbidden only if motivated by an unlawful purpose to discriminate against the Union or its adherents. A general bias or a general hostility and interference, whether proved or conceded, does not supply the element of purpose. It must be established with respect to each discharge. But antiunion bias and demonstrated unlawful hostility are proper and highly significant factors for Board evaluation in determining motive. N. L. R. B. v. WTVJ, Inc., 5 Cir., 1959, 268 F.2d 346; Smith Transfer Co. v. N. L. R. B., 5 Cir., 1953, 204 F.2d 738, 739–740.

 We have no doubt as to the Employee James A. Clark. He was discharged the day following the first organizational meeting. The evidence was such that it did not compel acceptance of the Employer's contentions that Clark was discharged because he solicited union authorization cards from fellow employees contrary to a no-solicitation rule and under circumstances interfering with essential work. There was great doubt about existence of any such rule and its prior publication or posting, and whatever doubts arose from pre-discharge actions were dispelled by post-discharge efforts for reinstatement. The Employer by words which, if credited as stated, reflected their own motivation, N. L. R. B. v. Ferguson, supra, adequately demonstrated that Clark's discharge came from his union interest.

 Nor do we as to James Elton Gibson and Berley L. Howard. Gibson was the target of much employer § 8(a) (1) coercive conduct. When he withstood this pressure and openly asserted that the Union was not going to be driven off, the plant superintendent charged that his overseer had reported that his production was low. The overseer denied making any such report and an analysis of the so-called "write-ups" on performance deficiencies were open to considerable question. True, two such events, absence from work because of illness and failure to clean air vents on February 5, were recited with substantial correctness. But there was sufficient basis, including credited testimony that Phillips, the overseer, never complained about failure to clean the air vents, to justify the inference that, even though accurate, these reasons given on the hearing were a pretext for the discharge. Mrs. Howard was likewise the target of Phillips' threatening predictions. Despite ten years of service her work then became the frequent subject of criticism by the two overseers, neither of whose testi-

mony was credited and was almost invariably rejected by the trier. The "write-ups" as to her were also dubious both from intrinsic ambiguities and a sharp conflict on the underlying facts constituting the incidents.

■ The matter is much more uncertain as to Wilton Russell Bryant and George Newman. On objective facts all that seems to uphold the Board's decision as to Bryant is the fact that as would any respectable father, he acknowledged that his son, Sonny Bryant, was a good union man, the head of a union in a nearby electrical plant and one of those extremely active in setting up and conducting the first organizational meeting the night before. His discharge followed a few hours later. Offsetting this was evidence showing that reduction in maintenance work which Bryant was hired to do now required but one man, and the Employer picked the other (Montgomery) on the basis of comparative experience and efficiency. But the evidence does not end there, nor did the incident of his discharge. When he returned the next day to get his paycheck, he asked the plant superintendent if it was not a fact that he had been fired because of his own or his son's union activities. To this the plant superintendent replied, "Well, if that's the way you want it, that's all right with me. I want it to be a lesson to the rest of the employees." Thus it was a case of " * * * words attributed to those authorized to speak for management" which, we pointed out in N. L. R. B. v. Ferguson, supra, if they "are credited as having been said, their form and content and context eliminate all doubt on motive."

■ But as to George Newman, there is neither objective evidence nor credited expressions of incriminating motive. He was, to be sure, like others a target of § 8(a) (1) pressures. But his discharge was quite different. During the week prior to February 5, he was told by his overseer that a drawhand frame operator would take his job under a share-the-work program about which

there seems to be no question. Newman's only concern was why a drawhand frame operator, rather than another classification, would be selected. Subsequently the plant superintendent called Newman in and said he understood Newman did not know why he was off during the preceding week. The plant superintendent then said, "Well, George, because you don't understand, I am going to lay you off and call it no work available."

That statement, on its face, is susceptible of many meanings, some permissible, some unlawful. Its variables are not reduced by reading prior § 8(a) (1) utterances into this episode. The threat implicit in the plant superintendent's question earlier made to Newman as to what Newman thought the Union could get him "besides fired or [his] job" is not sufficient. Nor was it aided by the superintendent's answer to Newman's earlier assertion that the plant would not really close as the divisional superintendent had publicly stated to the assembled employees would be the case if it were organized. To that the plant superintendent replied that they would just have to wait and see, but Newman should reconsider the matter. When Newman then asked if he was being fired, the plant superintendent replied, "No, there is plenty of time if that was necessary."

The bias and coercive threats were fully established, but except for union membership nothing else was proved save these equivocal conversational exchanges to show that this employee's discharge came from a purpose to discriminate. This unlawful motive "is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one." N. L. R. B. v. McGahey, 5 Cir., 1956, 233 F. 2d 406, 413. This record, with all of its uncertainties, does not meet the standard set forth with logical clarity in N. L. R. B. v. Fox Mfg. Co., 5 Cir., 1956, 238 F.2d 211, 214, 215, amplifying the principles discussed in N. L. R. B. v. Coats

& Clark, Inc., 5 Cir., 1956, 231 F.2d 567, 572, modifying the rule of N. L. R. B. v. Houston Chronicle Pub. Co., 5 Cir., 1954, 211 F.2d 848, 854. See also N. L. R. B. v. West Point Mfg. Co., 5 Cir., 1957, 245 F.2d 783, 786; N. L. R. B. v. Birmingham Pub. Co., 5 Cir., 1959, 262 F.2d 2.

The § 8(a)(5) Refusal to Recognize.

The Employer categorically declined to recognize or bargain with the Union on the forthright, albeit risky, ground that the Union did not represent an uncoerced majority of the employees. Alleviating the calculated risk in that bolder course were the Board's nose-count finally to go against it, the Employer had a second line of defense. This was that even though there was an actual numerical majority, the Employer's refusal to recognize was motivated by a good faith doubt.

■ Cutting a big figure in that defense was the Union's first seeking, later withdrawing, the Board first ordering, later dismissing, a representation proceeding for a Board-conducted election. On the hearing before the Examiner, before the Board and now here, all have been principally preoccupied with the first issue—the numerical count. We briefly discuss this only in passing as we think that the subsidiary defense of good faith was established. Despite this, considering the substantial size of the employee population involved, it is still worthy of some mention as it dramatizes just how close the count really was. Of course, a majority is a majority, and a majority of one, as in political affairs, is as potent as unanimity. But the more narrow the margin of victory, the more complex or unclear the ground for sustaining or rejecting challenges to given ballots counted or not counted, the more basis will there generally be that the doubt as to a majority, though finally unfounded, was at least maintained in the best of considered good faith.

It was finally stipulated that there were 332 employees in the bargaining unit. This required a minimum of 167 authorization cards. At the hearing, the General Counsel presented 188 cards. After rejection of some by the Trial Examiner and the Board and withdrawal of others by the General Counsel, the Board found that 172 were valid. It may be, as now contended, that the figure should have been 176 because of inadvertent arithmetical errors. The Employer, starting with the 188 cards, deducting those for persons not in the unit, not on the agreed payroll, rejected by the Trial Examiner and 6 rejected by the Board, came out with a count of 167—a bare majority of one, not 5 as found, or 9 as now urged. And having reduced it to this narrow margin, the Employer then urged that a great number of cards should have been rejected because they were, at most, intended by their signers as an authorization for an election, but not representation in the absence of an election certification.

But there was much more than this razor thin majority to justify the Employer's doubt. This was the action of Union and Board in connection with the very problem of majority representation. The Union, by letter dated December 16, but probably sent a day or so later, demanded that the Employer recognize the Union and commence bargaining with the named committee. The letter stated that "If there is any question about the majority having designated this Union as their agent for collective bargaining purposes, we are prepared to promptly prove same either by a check of cards before a mutually agreeable impartial person, or in an immediate secret election by the National Labor Relations Board, or some other acceptable agency." But before the Employer could even reply, and most likely before the Employer ever got the letter dated and supposedly sent December 16 (a Sunday), the Union filed a formal petition for a representation proceeding with the Board on Monday, December 17. The Board's regional office advised the Employer of this about December 18–19. The Employer advised the Board, as it did the Union by letter on December 21, that it doubted the ma-

387

jority status and would therefore decline to grant recognition or commence bargaining.

The Board treated it as a bona fide controversy and held a formal hearing on the representation petition on January 17, 1957. At the hearing, question was raised not only as to majority representation, but as to the appropriate unit. The Board held the matter under consideration until its order of February 28, 1957. This directed an election. That order also determined that the watchmen and guards, included in the Union's initial request, were excluded. The election ordered was never held.

Again, it was not action of the Employer, but rather that of the Union and the Board, which resulted in that election not being held. For while the representation petition was pending and before the order of election February 28, 1957, was issued, the Union filed charges of unfair labor practices on February 20, 1957. These charges were for the § 8(a) (1) and § 8(a) (3) violations discussed above. It was not until the second amended charge filed March 13, 1957, that the first charge of any kind was asserted for refusal to bargain "since on or about 12/16/56 when demand was made" on the Employer by the letter of December 16, 1956. With the order for election still outstanding, the Regional Director issued the complaint of May 29, 1957, on which the order under review was based. On June 5, 1957, the Board dismissed the representation petition by granting the Union's undisclosed motion of March 13, 1957, for withdrawal.

■■■■ Our decision is not a criticism of the Board for the dismissal, as such, of the representation proceeding. There is a certain logical consistency to its position. The charge and complaint in essence claim that the Employer is guilty of an unfair labor practice because it refuses to recognize a union having a majority status. A representation proceeding, on the other hand, is premised on the express interim conclusion that there is a doubt as to majority representation. Both proceedings ought not to be maintained simultaneously since, as the Board held here, "a representation proceeding and an unfair labor practice proceeding alleging refusal to bargain are mutually inconsistent." 121 N.L.R.B. 82, at ——. Nor, as the prior decisions of this and other courts attest, does the filing or simultaneous pendency of such a proceeding afford an automatic insulation exonerating the employer against actions which amount to unfair labor practices. See N. L. R. B. v. Southeastern Rubber Mfg. Co., 5 Cir., 1954, 213 F.2d 11, 15; N. L. R. B. v. Stewart, 5 Cir., 1953, 207 F.2d 8, 11–12; N. L. R. B. v. Armco Drainage & Metal Products, Inc., 6 Cir., 1955, 220 F.2d 573, 576–577, certiorari denied 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748; Franks Bros. Co. v. N. L. R. B., 1944, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020.

On the other hand, the filing and pendency of the representation proceeding cannot be ignored altogether as the Board has here done. Its significance in a § 8 (a) (5) refusal to bargain charge is not confined to the narrow, unique situation of Aiello Dairy Farms, 110 N.L.R.B. 1368. The machinery of the Board is to vindicate public, not private, rights, N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243, and where the situation reasonably calls for an impartial determination of a serious controversy, it is reasonable for an employer to expect that official processes once invoked may be used for its resolution.

No one could contend that from the very outset there was not a real controversy. That controversy centered around the cards held on December 16 for the Union claimed and the Board found that all cards counted were signed on or before that date. That date was critical for this case does not involve a change, plus or minus, thereafter. The Union from December 16 on claimed a majority. The Employer immediately and continuously disputed this. Neither won a resounding victory, and the final result was both narrow and late in coming. In the meantime what was this Employer—

holding this genuine doubt which nearly turned out to be an actuality—to do? Did the price of good faith mean that he must capitulate? If he · was entitled to an opportunity to consider and evaluate it, how long was he given?

Surely he did not have to answer on December 17. An answer by December 21 would be timely. Since before the letter could even be acknowledged the Union had already filed the representation petition, was it evidence of the Employer's bad faith when he declined, as the Union's letter alternatively suggested, to make a card count through some unidentified impartial person? To the contrary, was it not perfectly reasonable that the Employer would accept the other alternative specified—a Board election—machinery for which the Union had already set in motion? Was it not reasonable that he at least defer affirmative action pending determination whether the Board would accept the representation petition? Once the hearing on that petition was held on January 17, 1957, was it not reasonable that he await the decision? And once the decision was made and the election ordered on February 28, 1957, was it not utterly reasonable that he abide that order? In the light of these events was it not reasonable that he thought the Board's action put the imprimatur of law upon the existence of doubt since the statutory basis for the Board's action requires the existence of a question. It requires first an investigation and hearing to determine whether there is "reasonable cause to believe that a question of representation * * * exists." And as a condition to ordering an election, the Board must thereafter specifically find "upon the record of such hearing that such a question of representation exists." 29 U.S.C.A. § 159(c) (1) (B).

And were these actions not reasonable. as supposed, what was he to do? How was he to go about it? What tools could he use? He might have requested to see the authorization cards. But that would not have been enough. The Union had already indicated it would not trust the count or validity of the cards to the Employer. This was to be by a "mutually agreeable impartial person." Assuming that despite its unilateral choice of the alternative of a Board proceeding, the Union would have still agreed to this method and an impartial person had been chosen, even this might have proved to be insufficient. For it was the Employer's contention—then and since—that a great number of these cards did not represent the voluntary wishes of such employees.

How was this critical fact to be determined? True, an employer does have the legal right to interrogate to find out. Parks v. Atlanta Printing Pressmen and Assistant's Union No. 8, 5 Cir., 1957, 243 F.2d 284, 288, especially at note 7, certiorari denied 354 U.S. 937, 77 S.Ct. 1397, 1 L.Ed.2d 1537, on rehearing 5 Cir., 248 F.2d 386. But like Odysseus, he stands almost helpless as he makes the perilous passage between Scylla and Charybdis. If he makes a simple inquiry of each employee and accepts the simple answer, the very pressures apprehended may well bring about the employee's confirmation as well. If he probes deeper, the inquiry unavoidably becomes an investigation and soon it is inescapable that there be insinuations or intimations in terms of relative evaluation of union or nonunion conditions. At that point, undefined and undefinable, the inquisitor trespasses either on forbidden ground or flounders in the Serbonian bog, Landress v. Phoenix Mut. L. Ins. Co., 1934, 291 U.S. 491, 499, 54 S. Ct. 461, 463, 78 L.Ed. 934, 938, surrounding it so that what started out to be a means of compliance with law is turned into an affirmative charge of an unfair labor practice. And all the while, all that is done, all that is said, all that is asked, all that is answered, rests in the uncertain recollection of the partisan participants. What begins as the employer's quest now ends in the employer's flight. And now no longer will his conduct be judged alone by what was said. Now, through the unavoidable nature of our legal administrative machinery, N. L.

R. B. v. Ferguson, supra, it will be judged by what interested partisans say one said was said, or what others said to have said say was said.

As we have pointed out in Parks v. Atlanta Printing Pressmen and Assistant's Union, No. 8, supra, and Cone Bros. Contracting Co. v. N. L. R. B., 5 Cir., 1956, 235 F.2d 37, 42, self-help under these circumstances is tortuous and fraught with danger. Substituting partisan determination of controversies through the means of volcanic pressures of an industrial conflict for that of impartial disinterested governmental machinery ought not to be encouraged.

 Under the special circumstances of this case, it was reasonable for the Employer to assume that the law would resolve its good faith doubt concerning the Union's majority by the election requested and shortly ordered. The subsequent dismissal of those proceedings with the filing of the unfair labor complaint cannot deprive its interim actions of that cloak of reasonableness and good faith doubt. The order as to § 8(a) (5) may not, therefore, stand.

Enforced in part and denied in part.