## NATIONAL LABOR RELATIONS BOARD v. J. GREENEBAUM TANNING CO.
### No. 6998.

Circuit Court of Appeals, Seventh Circuit.
March 22, 1940.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, and Allen Heald, Ramey Donovan, and Louis Newman, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

John L. McInerney, of Chicago, Ill., and Leon B. Lamfrom and Egon W. Peck, both of Milwaukee, Wis., for respondent.

Before EVANS, TREANOR, and KERNER, Circuit Judges.

TREANOR, Circuit Judge.

This case is presented to this Court by the petition of the National Labor Relations Board for the enforcement of its order against respondent. The order was issued under Section 10(c) of the National Labor Relations Act.[1] Respondent is an Illinois corporation and has its principal offices in two plants at Chicago, Illinois, where the alleged unfair labor practices oc-

[1] 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

curred. The necessary jurisdictional facts exist.

The Board found that respondent dominated and interfered with the formation and administration of the Association and contributed financial and other support to it; that respondent discriminated in regard to the hire and tenure of employment of Wojdyla, Zych and Froelich and thereby encouraged membership in the Association and discouraged membership in the Union; and that by the foregoing acts respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act.

In accordance with the findings the Board concluded that respondent had engaged in unfair labor practices within the meaning of Section 8 (1), (2) and (3) of the Act.

The order of the Board required respondent to cease and desist from the unfair labor practices and from giving effect to its contract with the Association. The Board required respondent to take the following affirmative action: (1) withdraw all recognition from the Association as a bargaining agency of its employees; (2) disestablish the Association as such representative agency; (3) offer reinstatement with back pay to three employees against whom it had discriminated; (4) reimburse all employees for any dues which respondent had deducted from their earnings on behalf of the Association; and (5) post appropriate notices.

The questions presented by the petition may be stated as follows: (1) are the findings of fact supported by the evidence? (2) is the Board's order within the authority conferred upon the Board by the Act and is it justified by the findings?

The Association was organized among the workers of respondent's plants during May, 1937, and within a few days was recognized by respondent as the bargaining agency of its employees. For several years prior to May, 1937, an Employees Benefit Association had been in existence in respondent's plants. This organization was financed by a weekly payroll deduction of 5¢ for each employee and an equal contribution from respondent. The deductions and contributions were paid into the general funds of the Benefit Association. During the existence of the Benefit Association all negotiations between it and respondent's officials were handled by a shop chairman, Roy Breen, who was a member of the Benefit Association, and by Jack Nunsek, president of the organization. Breen testified that as shop chairman during the existence of the Benefit Association he went through the plant on business connected with the Association "every day, every time I wanted to" on company time. Employees generally were not permitted to leave their respective floors during working hours.

After the Supreme Court sustained the constitutionality of the National Labor Relations Act the assistant to the general manager of respondent's plants summoned Breen and Nunsek to his office and told them that the company could no longer continue its contributions to the Benefit Association and that the employees "would have to form a new" organization and "quit the old one."

Within two days after the foregoing conversation Breen had notices printed announcing a mass meeting to be held on the night of May 13, the notices stating that the meeting was to be "concerning the Wagner law." Breen, with the assistance of other employees, distributed the notices among the employees during working hours. Breen testified that he paid for the printing of the notices with money which he had borrowed from Martin Samp, an employee in the office of respondent. The meeting was held in a rented hall and approximately 250 employees attended. Representatives from the Union, the National Leather Workers Association, Local No. 43, who sought an opportunity to present arguments in favor of affiliation with the Union, were removed from the meeting by policemen, and several of the representatives were arrested. The meeting was addressed by the attorney for the old Benefit Association and by another attorney who spoke Polish for the benefit of the Polish employees. The speakers outlined the provisions of the Wagner Act and advised that the old Benefit Association was illegal. They informed the men that they could join any union of their choice but discussed fully the procedure for the organization of an unaffiliated union. The meeting authorized the treasurer of the old Benefit Association to retain its funds pending further action; no action was taken to dissolve the old Benefit Association.

Breen testified that he and Leo Rounds, an employee who took an active part in the meeting of May 13, decided that the em-

ployees wanted a new association of their own and that they prepared to organize such an association without consulting the fellow employees. A most vigorous membership campaign by Breen, Samp and Raymond Demski was conducted during working hours, and employees were solicited in the presence of respondent's foremen, and there is testimony that representatives of the management participated in the solicitation. Breen testified that he had told Arthur Hirsch, plant superintendent, of the organization activities.

The Board was justified in inferring that the organizational activities were known to and approved by the management and that the management definitely encouraged the activities, and there is substantial evidence to justify the conclusion that "coincident with its decision to discontinue its contributions to the Benefit Association and to bring about its dissolution, the respondent embarked upon a course of conduct to encourage and support the formation and administration of the Association;" and that "the respondent gave the Association its initial impetus and played a vital part in guiding the course of its organization through its control of the Benefit Association."

While employees were being solicited for membership in the Association Breen circulated notices of a meeting of the Association for the election of officers. The meeting was held on the night of May 21. At this meeting a resolution was adopted providing for the formation of the Association, and employees were nominated for offices in the Association; May 24 was selected as the date for the election. A draft of the constitution and by-laws, which had been previously prepared, was submitted and adopted. It appears that the attorney for the old Benefit Association drafted the constitution and by-laws, although the testimony does not disclose the source of his authorization nor the time when the constitution was drafted. On May 24 the election of officers for the Association was held in the shipping rooms of respondent's plants. Breen and Gabowski, who had served as shop chairman and treasurer of the old Benefit Association, were elected to the same offices in the Association. Two other officers of the old organization were continued in office and two new men, Demski and Mader, were elected president and secretary, respectively.

Within two days a contract was drafted, negotiated, and executed by respondent and the Association. The contract provided for (1) recognition of the Association as collective bargaining agency; (2) a closed shop; (3) the checkoff of Association dues; (4) a 5% wage increase; (5) machinery for adjustment of grievances. By the terms of the contract an employee was given three days within which to decide whether or not he desired to become a member of the Association. The testimony respecting the origin and execution of the contract presents conflicts and is quite vague at the best. Breen, the most active person in the formation of the Association, was uncertain about the contents of the contract. His explanation was that he was "only the chairman"; and that "the president takes care of that stuff." But Breen also testified that the attorney drafted the contract after he had told the attorney over the telephone to draw up a contract with a closed shop clause. There was no testimony that the members of the Association had authorized the preparation and negotiation of a contract and Breen was unable to give any information as to whether the Association had authorized the closed shop clause. He testified that "maybe Ray Demski and myself talked about it." Demski testified that Breen was given the responsibility of communicating to Moland, the attorney, an outline of the proposed contract as worked out at a meeting of the Association officers; and Demski testified that this meeting was the first meeting of the Association's officers and was called by Breen. Yet Breen testified that the closed shop was not discussed at the first meeting of the officers and also testified that the first meeting was the only meeting that he attended. Breen testified that when the contract was presented to respondent there was not any question about signing it; and that they signed it up "right away"; that "we just talked about an hour." Demski testified that respondent opposed the closed shop and seniority provisions and that after an hour and a half discussion, reserved decision until the next day. But it is clear that respondent did sign the contract on the next day, which was May 27, without any change in the form as drafted by the attorney and approved by the officers of the Association.

Early on the morning of May 27, whether before or after the signing of the contract by respondent cannot be determined

from the record, three employees, Wojdyla, Zych and Froelich, who had refused to join the Association, were discharged. On June 25 the funds of the old Association in the amount of $1,233.66 were turned over to the new organization. In the following November the Association acquiesced in a reduction of working hours, and shortly thereafter the Association accepted a 20% wage reduction.

The three Association officers, Breen, Mader and Demski, informed Froelich, Wojdyla and Zych that they were discharged. Froelich testified that superintendent Hirsch was about ten feet away at the time that Breen announced to him that he was discharged; and that after Breen's departure Hirsch came over and said "I am sorry, John, it's a cinch I can't do anything about it. I couldn't help it." Hirsch admitted that he was present but denied that he spoke to Froelich. He testified that he heard Froelich say "They are through with me, but I am not through with them yet." Breen secured Froelich's and Wojdyla's checks from respondent's office and Demski offered to secure Zych's check for him but Zych left the plant without waiting for his check. Respondent does not contend that the discharge of the employees was justified under its closed shop contract; and in its answer to the Board's complaint it stated that the men "voluntarily quit respondent's employment." And in its brief filed with the Board respondent urged that Breen's action "not only lacked the authorization of the respondent but in addition thereto was in direct violation of the agreement."

In view of the testimony relating to the discharges of the three men we think the evidence supported the Board's inference that the respondent approved and ratified the action of Breen and his associates.

■ We have not attempted to set out in detail the testimony, but we are of the opinion that there was substantial evidence to support the finding of the Board that respondent had engaged in unfair labor practices within the meaning of Section 8 (1) (2) and (3) of the National Labor Relations Act; and we are of the opinion that the cease and desist provisions of the Board's order follow the finding and are authorized by the Act. When there is a

valid finding that an employer has interfered with the worker's free choice of selection of his bargaining agent and has discriminated in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization "such action on the part of [an employer] would make inoperative the '8 (3)' proviso, which sanctions closed-shop contracts, since the proviso's two conditions are absent, i. e., an uncoerced and nonassisted majority."[2] Consequently, that part of the order which requires respondent to cease giving effect to its closed shop agreement was valid as well as the requirement that respondent cease and desist from the specifically charged unfair labor practices.

The affirmative remedial provisions of the order required (1) withdrawal of recognition of the Association; (2) reinstatement with back pay of the three employees discriminately discharged; (3) reimbursement to employees for dues checked off to the Association by respondent, and (4) the posting of notices in the form customarily employed in orders of the Board.

■ Under the decisions of the Supreme Court it is clear that a disestablishment order is a valid remedy when an order merely to cease and desist from unfair labor practices would leave a situation under which the employees are not entirely free to act upon their own initiative in respect to collective bargaining. In National Labor Relations Board v. Newport News, 60 S.Ct. 203, 208, 84 L.Ed. —— (Dec. 4, 1939) the Supreme Court stated that it could not say that it was error for the Board to hold "that, where an organization has existed for ten years and has functioned in the way that the Committee has functioned, with a joint control vested in management and men, the effects of the long practice cannot be eliminated and the employes rendered entirely free to act upon their own initiative without the complete disestablishment of the plan." In National Labor Relations Board v. Greyhound Lines[3] the Supreme Court recognized that there might be situations in which the Board would not be warranted in requiring "withdrawal of employer recognition of an existing union before an election by employees under section 9 (c), 29 U.S.C.A. § 159(c), even though it had or-

2 Jefferson Electric Co. v. National Labor Relations Board, 7 Cir., 102 F.2d 949, 955.

3 303 U.S. 261, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307.

dered the employer to cease [and desist] unfair labor practices"; but the court recognized the disestablishment order as proper in a case where the employer, by unfair labor practices, had "succeeded in establishing a company union so organized that it [was] incapable of functioning as a bargaining representative of employees."

The following excerpts from the Supreme Court opinion in National Labor, Relations Board v. Pacific Lines[4] describe a subtle, but effective, type of coercion which may continue to exist despite the usual cease and desist order, if an old arrangement is continued: "In ordering withdrawal of recognition of the Drivers' Association by respondent, the Board pointed out that a mere order to cease the unfair labor practices 'would not set free the employee's impulse to seek the organization which would most effectively represent him'; that continued recognition of the Drivers' Association would provide respondent 'with a device by which its power may now be made effective unobtrusively, almost without further action on its part. Even though he would not have freely chosen' the Association 'as an initial proposition, the employee, once having chosen, may by force of a timorous habit, be held firmly to his choice. The employee must be released from these compulsions.'" The Supreme Court adds that "whether the continued recognition of the Drivers' Association by respondent would be a continuing obstacle to the exercise of the employees' right of self-organization and to bargain collectively through representatives of their own choosing, was an inference of fact which the Board could draw if there was evidence to support it." And the Court concluded that it could not say "that the Board's conclusion was without support in the evidence and in the subsidiary findings which respondent does not challenge."

We cannot say that the evidence did not support the inference of fact, which the Board drew, that the continued recognition of the Association by respondent would perpetuate indefinitely the respondent's influence in the administration of the affairs of the Association and thereby deprive respondent's employees of their full degree of independence and collective bargaining which the Act guarantees. In respect to the disestablishment order, we believe that the facts of this case bring it within the reasoning and holding in the Greyhound Lines, Pacific Lines and Newport News cases, supra.

As a part of the Board's order the respondent was required to reimburse employees for dues checked off to the Association by respondent. We are of the opinion that this portion of the Board's order should not be enforced. Such a requirement can be justified under the Act only on the ground that it constitutes affirmative relief which will effectuate the policy of the Act. But by order of the Board, the respondent is required to refuse recognition to the Association, and the Association as a representative of the employees for purposes of collective bargaining ceases to exist; and in view of the foregoing it seems that requiring the respondent to reimburse the employees cannot contribute anything to the effectuation of the policy of the Act. It might have a deterrent effect generally in respect to the check-off practice, since employers surely would hesitate to engage in the check-off practice for the benefit of organized labor groups if there should remain the possibility that the employer may find itself compelled to reimburse employees for sums which the employees have authorized the employer to check-off. It is not apparent that the coercive effect of respondent's unfair labor practices affected the payment of dues by the check-off system to any greater degree than it would if payment of dues should be made directly by employees to the Association. In either case the object of the coercion is membership of employees in the Association and the payment of dues is not in itself an instrument of membership coercion. It is true, as suggested by petitioner, that the payment of dues gave financial stability to the Association, but that ceases to be material when recognition is withdrawn from the Association and it is disestablished as the representative of the employees for collective bargaining with the respondent. The important fact is that under the order of the Board, apart from the reimbursement provision, the respondent can no longer have any relations with the Association, including the check-off relation, as the representative of the employees. Petitioner urges that there will be a continuing element of coercion "as long as the employees remain unreimbursed for the money so exacted from them, * * * for the employees still have a financial stake, by rea-

4 303 U.S. 272, 275, 58 S.Ct. 577. 578. 82 L.Ed. 838.

son of the unfair labor practices themselves, in the perpetuation of the illegitimate organization." Assuming that there is a coercive factor in the financial stake of the employees in the Association, we do not understand how the reimbursement will diminish the financial stake. The net result will be that the employees get back the amount of their dues without diminishing the financial resources of the treasury of the Association.

Petitioner relies on the analogy of an order of the Board requiring reinstatement with back pay of an employee who has been illegally discharged. That remedy, however, is definitely authorized by the Act, and, in addition, is obviously a remedial device which is necessary to insure the effectuation of the policy of the Act. Furthermore, by force of the Act, an employer is legally incapacitated from severing the relationship of employer and employee by an unlawful discharge, and the employee has a legally protected tenure which, in the absence of special circumstances, carries with it the right to wages. The Act thus creates a very definite legal right in the employee as the basis for the exercise of the authority of the Board to order reinstatement with back pay as a remedial measure.

The facts relating to the check-off practice in this case, and they are typical, do not justify an inference that the enforcement of the reimbursement order will contribute to the effectuation of the policy of the Act; and we are of the opinion, as indicated above, that the result of its enforcement will be merely to discourage the check-off practice which, at the most, is merely incidental to an unfair labor practice, and which must lose all significance with the termination of the unfair labor practice by a cease and desist order supplemented by an order which compels withdrawal of recognition and disestablishment, of the existing labor group which had been acting as the bargaining representative of the employees. The reimbursement order becomes in fact punitive rather than remedial.

The Board is directed to modify its order by omitting the requirement that respondent reimburse its employees for Association dues collected by the check-off.

Our holding that the Board was without authority to order the respondent to reimburse its employees for the Association dues does not affect any private right of any employee in the Association funds, nor foreclose the adjudication of any claim, whether well founded or not, against the respondent in respect to the check-off of dues.

We find no ground for modifying or setting aside either the reinstatement provision or the provision relating to the posting of notices.

The order of the Board, as modified in respect to reimbursement, is affirmed and ordered enforced.