PUERTO RICO LABOR RELATIONS BOARD, Petitioner, v. ABELARDO CEIDE, d/b as FINCAS VICTORIA Y CARRIZALES, Respondent. ABELARDO CEIDE, d/b as FINCAS VICTORIA Y CARRIZALES, Petitioner, v. PUERTO RICO LABOR RELATIONS BOARD, Respondent.

Nos. JRT-62-7, JRT-62-8.          Decided December 20, 1963.

*Hartzell, Fernández & Novas,* and *Héctor M. Laffitte* for petitioner. *J. B. Fernández Badillo, Solicitor General, José Orlando Grau,* and *J. F. Rodríguez Rivera* for the Labor Relations Board. *Sarah Torres Peralta, Ginoris Vizcarra,* and *Federico Rodríguez Pagán* for amici curiae.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On October 16, 1959, the Labor Relations Board of Puerto Rico entered a decision and order in case No. CA-2085[1] di-

---

[1] In that decision and order the Board sums up the facts which the Trial Examiner found proved as follows:

"After the Board certified it as the representative of a majority of the employees used by defendant in an appropriate unit for collective bargaining, the Union of Workers of Barrio Palmar, affiliated with the Union of Workers UPWA–AFL–CIO, required the appellee to negotiate a collective agreement for the 1959 crop season. The appellee met with the Union on several occasions, but he did not accept the proposed agreement, nor considered it properly, nor made counterproposals of any kind, alleging that his financial condition would not permit it. In view of appellee's insistence that he was in a difficult financial condition, the Union modified its demands in order to reach an agreement, but the appellee insisted on his position that he could not accept any of the clauses of the proposed agreement. The appellee also alleged that he could not accept an agreement which would include checkoffs because his employees had told him personally that they would not permit it. The appellee assumed a hermetic position at this stage of the discussion. He did not show flexibility or the attitude to reach an agreement. It was a final no without any possibility of compromise."

Owing to the relevancy to the present proceeding we further point out that, as it appears from a partial statement of the report of the Trial Examiner which is copied in the decision and order, employer Ceide was summoned on two occasions by the Union to discuss the collective agreement—February 17 and March 4, 1959—when the crop season for that year

recting employer Abelardo Ceide (a) to cease and desist from his refusal to bargain collectively with Union of Workers of Barrio Palmar, affiliated with the Union of Workers of UPWA–AFL–CIO,[2] as the exclusive representative of all his employees in the appropriate unit—all the workers employed by the employer on Victoria farm, of Aguadilla, engaged in the planting, cultivation, cutting and harvesting of cane—or with any other labor organization chosen by a majority of his employees in an appropriate unit for collective bargaining, when he was required to do so; and (b) not to interfere at all with, or restrain, or coerce his employees in the exercise of the rights guaranteed to them by § 4 of the Labor Relations Act of Puerto Rico, 29 L.P.R.A. § 65. In order to effectuate the purposes of the Act, he was ordered to take certain affirmative action and was particularly required to bargain collectively in good faith with the Union. The Board did not request this Court to enforce the said order pursuant to the procedure established in § 9(2)(a) of the Act, 29 L.P.R.A § 70(2)(a).[3]

_____

had evidently commenced, but he did not appear; that "he did not respond promptly to the invitations of the Union to appear to discuss the collective agreement."

[2] The Union had been certified on March 2, 1959, as the representative of the laborers for the purposes of collective bargaining in the record of certificate P-1425, after the parties signed an agreement of election by consent.

On January 26, 1962, when the Union filed the charge which gave rise to the present case, employer Ceide filed a petition under number PP-75 alleging that the Union did not have a majority of the employees, "since the laborers have told him of their own will that they would not want the checkoff or anything to do with the Union."

[3] This attitude of the Board was clearly due to the fact that the employer complied with the order issued. It appears from the evidence that on December 7, 1959 the employer and the Union signed a collective agreement to take effect on January 1, 1960.

It was also provided that in the event either party wished to express its desire to negotiate another agreement, the parties "shall meet in the month of September in an attempt to reach an understanding on the new

On August 4, 1961, Nicolás Ferrer, organizer of the Union, wrote a letter to employer Ceide in connection, among other things, with the discussion of the collective agreement to govern the labor-management relations commencing with the 1961–62 crop season, in the following words: "I take this opportunity to tell you that inasmuch as this year, as in the past, the crop season commences in December, it is necessary to discuss the new agreement as soon as possible so that no difficulties may be encountered at the commencement of the crop season." He did not receive a reply. On November 13 another letter was sent to him enclosing a copy of the proposed agreement, for his consideration, advising him that although in the previous year (1960–61) a new collective agreement was not signed, in which case the previous year's agreement would continue in force as provided by an extension clause in the absence of notice to the effect, "your laborers demand a new agreement." Again the employer did not answer this demand nor make a proposal of any kind. On December 7 he was invited to sign the agreement in the office of Manuel García Méndez and he was told that if he was not willing to meet, he would be expected in the offices of the Union "to discuss this matter." On this occasion Ceide broke his hermetic silence and wrote a letter to Ferrer expressing his surprise over the invitation to sign an agreement, "I don't know to what agreement you refer . . . I was not summoned at any time prior to November 30 of the present year for the purpose of negotiating a new agreement, as provided by the agreement which will expire on December 31 of the present year," and ended by saying that he cannot tell when he will be able to meet to negotiate because of his many occupations as a result of the commencement of the next crop season "do not allow me time for other things." In this situ-

---

agreement, if possible not later than November 1960, in order that the delay in reaching an understanding or agreement would not delay the commencement of the 1961 crop season."

ation the crop season commenced on December 16 without signing any agreement. However, in a letter dated December 20 the representative of the laborers again invited him to meet the following day. Again the employer ignored the Union's demand.

We have elaborated on this chronological statement of the facts concerning the attempts made by the Union to induce the employer to comply with his legal obligation to negotiate collectively, so as to appreciate in all its weight the conduct reiteratedly and consistently observed by Ceide which finally resulted in the filing of a charge of unfair practices with the Labor Relations Board. It is hard to conceive an attitude of greater disregard of the provisions which, as a question of public policy, the lawmaker has adopted to guarantee the stability and harmony in labor-management relations. Not only did he fail to comply with his duty to negotiate, but also sought to ignore the recognized representative of his workers and attempted to negotiate directly with the laborers without the knowledge of the Union, for the manifest purpose of discouraging membership of the employees in the unit which had been certified two years ago for collective bargaining purposes. Thus, according to his own admission, he informed the laborers that no agreement had been signed, but that "they would earn the same wage or salary which my neighbor, Comunidad Agrícola Bianchi, was paying which was greater than that provided by the Minimum Wage Act and the previous agreement," and that "immediately, almost unanimously, all the laborers told me that they did not want to join any union, that they would not permit any quota or contribution other than the Federal Social Security to be deducted from their wages. *This occurred the same day the cane cutting commenced.*"

On January 26, 1962, the Union resorted to the Labor Relations Board and filed charges of unfair practices based on the refusal to negotiate and interference with the rights

guaranteed to the employees by § 4 of the Act. Notice was served on the employer on January 31 and two days later he answered to the Examiner designated to investigate the charges that he had never been summoned to appear at a certain place or specific date to discuss the collective agreement, and *for the first time* he adduced as reason for his refusal to negotiate that his employees did not wish to form part of the certified contracting unit nor that their deductions be delivered to the latter entity. The Examiner went to Aguadilla to investigate the charges and took sworn statements on February 6 and 15. On February 28 he submitted a report to his immediate superior and on March 8 the latter in turn transmitted it with his recommendations to the Chairman of the Board. The corresponding complaint was filed on April 6 alleging that the employer had engaged in the unfair practices provided by paragraphs (d) and (a), subsection 1 of § 8 of the Act.[4] The hearing was held on April 26. Although the employer-appellee did not file written averments, he was represented and assisted during the hearing by his attorney, Santiago Quiñones Elías. In the course thereof the attorney for the Board presented several exhibits which were marked J-1(a) to J-1(p), all of which were admitted without objection and some by stipulation of both parties.[5] It was further stipulated that "the employer agrees

---

[4] These paragraphs, 29 L.P.R.A § 69(1)(a) and (d), read as follows:

"It shall be an unfair labor practice for an employer acting individually or in concert with others:

"(a) To interfere with, restrain or exercise coercion upon, or to attempt to interfere with, restrain or exercise coercion upon his employees in the exercise of the rights guaranteed in section 65 of this title.

"·         ·         ·         ·         ·         ·         ·

"(d) To refuse to bargain collectively with the representative of a majority of his employees in a unit appropriate for collective bargaining . . . ."

[5] The record of the former case CA-2085 within which similar facts were examined and the employer was ordered to negotiate with the certified representative of his workers forms part of the evidence admitted.

that the Labor Relations Board of Puerto Rico should issue an order in the sense that he sit down to negotiate a collective agreement with the duly authorized representative of complainant Union, after the said representative extends him an invitation in pursuance of law in order to proceed to negotiate.[6] The employer recognizes further that complainant Union is the collective representative of his workers." On May 28, 1962, the Trial Examiner rendered his report in which, after considering all the facts including those which gave rise to the order of October 16, 1959, he stated that "As a result of the foregoing actions of the appellee and those which we have found proved in this case, we have founded fear that in the future he may repeat similar unfair practices," and recommended that the Supreme Court be requested to enforce the order which the Board might enter.

On June 13, 1962, the Board entered a decision in case CA-2650 adopting with certain modifications the findings of fact and conclusions of law contained in the report of the Trial Examiner and which includes the following observations:

"We agree with the Trial Examiner in his observation that employer Abelardo Ceide has shown his reluctancy to bargain collectively with the representative of his employees, wherefore it is necessary for us to resort to all the provisions of the Act to compel him to comply with the mandate of our lawmaker that the terms and conditions of employment shall be established 'through collective bargaining.' Our Legal Division is hereby instructed to urge the Honorable Supreme Court as soon as possible to enforce our order.

"Considering that employer Abelardo Ceide conscientiously refused for the second time to bargain with the exclusive representative of his employees, *thereby depriving them of the benefits of collective bargaining during the 1962 crop season*, we believe that the best way to effectuate the purposes of the Act

---

[6] It was accepted that the formal demand to negotiate was made in the course of the same hearing.

and to repair the damage done is by giving retroactive effect to the collective agreement which may be signed, if any, pursuant to the terms hereof.

"We believe that the unfair practice committed will thereby be efficiently cured, since in refusing to negotiate the employer prevented the representative of his employees from obtaining a retroactive clause, as is usually the case in the agricultural phase of the sugar industry.

"Although in this particular case compliance with this new order of the Board could be considered in practice as a sort of sanction or penalty imposed upon the employer for the purpose of repairing the damage caused to the workers by refusing to negotiate with their collective representative—which we condemn personally—we have been prompted to adopt the same by a desire to remedy or prevent hereafter, particularly in the sugar industry in which the crop season is so short, that owing to mere technicalities or subterfuges, as has been established, the employer may delay the commencement of the negotiation to the extent of rendering it ineffective by merely waiting for the season to terminate, or sitting down to negotiate when the season is about to end."

In its dispositive part the employer was ordered to cease and desist from refusing to bargain collectively with the Union and from interfering with or coercing his employees in the rights guaranteed to them by § 4 of the Act, and, as affirmative action, to negotiate collectively with the exclusive representative of the employees; "Provided, that the collective agreement which may be signed, if any, be made retroactive to the commencement of the work of the employer in the 1962 crop season," and to post publicly certain notices.

Both the Labor Relations Board and employer Ceide resorted to this Court: the former, to enforce its order; the latter to request that the same be set aside or reviewed. We agreed to consolidate both petitions. In due time we granted intervention of amici curiae.[7]

---

[7] We point, in passing, the advisability of revising our Rule 18 on appearance as amicus curiae in order to determine more specifically the cases in which such intervention should be permitted. See *Craig* v. *Harney*,

It is alleged that the Board erred (a) in including a mandatory provision on retroactivity of the agreement the negotiation of which is ordered as being of punitive character and constituting also a due intervention of that agency in the process of collective bargaining; (b) in concluding that the employer's refusal to negotiate prevented the representative of his employees from procuring a retroactive clause, as is the practice in the agricultural phase of the sugar industry; (c) in ordering the employer to cease and desist from interfering with his employees in the exercise of the rights guaranteed to them by § 4 of the Act; (d) in ordering the employer to cease and desist from refusing to negotiate collectively "with any labor organization," without limiting him to the Union which represents his workers.

1–2. In the affirmative action which the Board believes is necessary to effectuate the purposes of the Act, employer Ceide was required to proceed to negotiate collectively with the Union, and it was expressly provided that "the collective agreement which may be signed, if any, be made retroactive to the commencement of the work of the employer for the 1962 crop season," which according to the statement of facts commenced on December 16, 1961. This retroactivity provision is challenged by appellee as a measure of punitive rather than remedial character, and by the amici curiae as contrary to the public policy of the Labor Relations Act of Puerto Rico as constituting an undue interference of the State in the process of collective bargaining.

■ (a) Section 9 (1) (b) of the Labor Relations Act, 29 L.P.R.A. § 70 (1) (b), provides that when the Board is of the opinion that any person has engaged or is engaging in an unfair labor practice, the Board shall issue an order

---

331 U.S. 367, 397 (1947) (dissenting opinion); *The Amicus Curiae*, 55 Nw. U.L. Rev. 469 (1960); *Amicus Curiae: Friend of the Court*, 9 De Paul L. Rev. 30 (1959); *cf.* Rule 42 of the Rules of the Federal Supreme Court.

requiring it to cease and desist from such unfair practice and to take such affirmative action as shall effectuate the purposes of the Act, including, but not limited to, reinstatement of employees with or without back pay, the posting or transmittal by mail of appropriate notices and the termination of collective bargaining contracts, in whole or in part, or make any other order against such person "that shall effectuate the purposes of this act." This broad discretion of the Board to provide the remedy is limited by the requirement imposed by the courts that it be "appropriate," *N.L.R.B.* v. *Link Belt Co.*, 311 U.S. 584, 600 (1941), and "adequate for the evil at hand," *N.L.R.B.* v. *Bradford Dyeing Ass'n*, 310 U.S. 318 (1940); Goldstein, *Effectuating Policies of the National Labor Relations Act*, 20 B.U.L. Rev. 74 (1940).

■■ Under a similar provision of the Federal Act, 29 U.S.C. § 160(c), in *Consolidated Edison Co.* v. *National L.R.B.*, 305 U.S. 197 (1938), this power of the Board was considered remedial rather than punitive, and it was said in the opinion at pp. 235 and 236 that: "We think that this authority to order affirmative action does not go so far as to confer a punitive jurisdiction enabling the Board to inflict upon the employer any penalty it may choose because he is engaged in unfair labor practices, even though the Board be of the opinion that the policies of the Act might be effectuated by such an order." In identical terms, in referring to the local statute, we said in *Rivera* v. *Labor Relations Board*, 70 P.R.R. 5, 13 (1949), that "our Act is remedial, not punitive." These isolated portions of these opinions have frequently been invoked, as does appellee Ceide, to resist the orders of the Board commanding certain affirmative action. However, it is necessary to explore more closely the true meaning of this characterization of "remedial act" to understand its true extent. Thus, in the same case of *Consolidated Edison, supra*, the Federal Supreme Court pointed out that the power of the Board to command affirmative action "is to

be exercised in aid of the Board's authority to restrain violations and *as a means of removing or avoiding the consequences of violation* [the unfair practice committed] *where those consequences are of a kind to thwart the purpose of the Act.*" The concept of remedial statute was explained more clearly in *Republic Steel Corp.* v. *National Labor Rel. Bd.*, 311 U.S. 7, 10 (1940), when after reiterating that the Act is essentially remedial, it is added: "It does not carry a penal program declaring the described unfair labor practices to be crimes. The Act does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees" (at p. 10). It is insisted that the affirmative action should tend to guarantee to the employees those rights consecrated by the statute, among which there stands out the right to negotiate collectively, and as an indispensable corollary, the right to enjoy the benefits obtained through negotiation. The affirmative action contemplated by the Act is aimed at reinstating the employee affected by the commission of the unfair practices in the same position which he would hold had it not been for the detrimental conduct observed. Among these measures the one which typically illustrates the foregoing is the payment of the benefits which he failed to receive, but in order to prevent any punitive character the exact amounts received by the employee in other activities are deducted, *Rivera* v. *Labor Rélations Board*, 70 P.R.R. 5, 13 (1949); *Phelps Dodge Corp.* v. *N.L.R.B.*, 313 U.S. 177 (1941); *Bon Hennings Logging Company* v. *N.L.R.B.*, 308 F.2d 548 (9th Cir. 1962); *National Labor Relations Bd.* v. *Suburban Lumber Co.*, 121 F.2d 829 (3d Cir. 1941); note, 45 Minn. L. Rev. 609, 633 (1961). Similarly, the employer has been compelled to afford to his employees adequate protection from acts of violence directed at discouraging membership in a union, *National Labor Relations Board* v. *Ford Motor Co.*, 119 F.2d 326 (5th Cir. 1941);

the disestablishment of a labor association has been ordered in order to avoid deprivation of freedom of the workers to withdraw therefrom, *National Labor Relations Bd.* v. *Newport News S.B. & D.D. Co.*, 308 U.S. 241 (1939) ; *National Labor Relations Board* v. *Greenebaum T. Co.*, 110 F.2d 984 (7th Cir. 1940), *cert. denied,* 311 U.S. 662 (1940) ; the enforcement of a closed-shop clause agreed upon with the union has been prevented, *International Asso., Etc.* v. *National L. Rel. Bd.*, 311 U.S. 72 (1940).

It is contended that the order of the Board on retroactivity of the agreement is of punitive character, "since the same is *economically burdensome* for the employer." Apparently it is anticipated that one of the fruits of collective bargaining shall be the fixing of salaries higher than those which the laborers of the Victoria and Carrizales farms received during the 1962 crop season. If this were so, it has been the conduct of appellee himself in refusing to discuss in due time, as required by the Union, what has given rise to the situation complained of. Indeed, within the remedial purpose of reinstating the aggrieved party in the same position which he would have held had it not been for the conduct constituting an unfair practice, this affirmative action is possibly the only proper action to effectuate the purposes of the Act. Its similarity to the orders requiring the reinstatement of the employee and payment of back pay is clear.

We are not impressed either by the contention that the Federal Board has not ordered the retroactivity of an agreement in a case of unfair practices as a result of a refusal to negotiate. The existence of different conditions in the Puerto Rican Labor Management climate in the agricultural phase of the sugar industry—the seasonal work which lasts only a few months a year, the negotiation of agreements to govern usually during the crop season, the great mobility of the labor force and the existence of relatively weaker labor organizations—may satisfactorily account for the need for this meas-

ure. See, however, by analogy, *N.L.R.B.* v. *Preston Feed Corporation,* 309 F.2d 346 (4th Cir. 1962).

■ (b) It is not necessary to cite generalities expressed by the courts to hold that our Act contemplates "free" collective bargaining. No one questions it seriously. However, we confront a situation of facts which is not proper for the application, without critical sense, of this abstract principle, no matter how vigorously it is urged that it coerces the freedom of the contracting parties and precludes collective bargaining. Having examined the situation in its actual perspective, it appears clearly that the order of the Board, insofar as it refers to the 1962 crop season, actually has the effect of restoring to the Union the freedom of which it was precisely deprived by the employer by harassing tactics to refuse to discuss the agreement, and, what is even more serious, to let the crop season come to an end without negotiating it. It is actually specious to invoke the free character of the collective bargaining when one who so invokes it has frustrated the bargaining power of the aggrieved party.

We agree that one of the basic objectives of the Act is to promote collective bargaining. However, we cannot be oblivious to the fact that we are confronting a very special situation in which, as stated in the brief of the Board, "the employer has rendered inoperative the freedom of the parties at the collective bargaining table," which requires the removal of the consequences of the unfair practice committed in order that in the future the parties may fully enjoy the freedom consecrated by the lawmaker. Furthermore, the Board's interference in ordering the "retroactivity" does not have the scope attributed to it, since in our opinion it does not impose any substantive condition in the negotiation; it merely requires the parties to negotiate with a view to reaching an agreement, but whatever it may be, even if it does not provide greater economic benefits for the Union and its members, and by its very terms, if such agreement is reached, it

covers a period prior to the date of the order. The measure adopted rather operates as a brake to warn the employer that in the long run he will gain nothing by employing dilatory tactics in the negotiation. It is not the case, as in *N.L.R.B.* v. *Insurance Agents International*, 361 U.S. 477 (1960), where the Board has attempted to control the economic weapons available to the parties which permit it to intrude indirectly into the formulation of the agreement. See Notes in 21 Md. L. Rev. 234 (1961); 35 Tul. L. Rev. 255 (1960); 58 Mich. L. Rev. 1235 (1960); 109 U. Pa. L. Rev. 134 (1960); 74 Harv. L. Rev. 185 (1960). *Cf. N.L.R.B.* v. *Philamon Laboratories, Inc.*, 298 F.2d 176, 182–83 (2d Cir. 1962).[8]

It is well to clarify, however, that inasmuch as since this petition was filed not only the 1962 crop season but also that of 1963 have elapsed and the price of sugar has undergone a marked ascending change in the latter season, the order to negotiate agreements for those years should not be taken to mean that the conditions have to be identical for both years. See Act No. 38 of May 31, 1963 (Sess. Laws, p. 56), which amended § 9 (e) of the Minimum Wage Act of 1956, on increases and determinations of average price of sugar.

The danger pointed out that in the future the Board may attempt to interfere with the negotiations in order to impose other conditions such as wage rates, working days, bonus payment, and the like, is more apparent than real. It has not been pointed out to this Court, nor have we any knowledge, that the Commonwealth Board in its 18 years of administration of the statute has attempted to interfere unduly in this aspect of the labor-management relations. In any event, resort may always be had to the courts to prevent any departure in this sense. It is well to point out that this

---

[8] In connection with other affirmative actions commanded by the Federal Board to effectuate the purposes of the Act, see *Morrison-Knudsen Co.* v. *N.L.R.B.*, 275 F.2d 914 (2d Cir. 1960), on reimbursement of dues to the Union members, commented in 13 Stan. L. Rev. 401 (1961).

aspect of the Board's interference in the procedure of collective bargaining is in process of clarification and delimitation. *Cf. N.L.R.B.* v. *Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342 (1958), commented on in 43 Minn. L. Rev. 1225 (1959), 13 Rutgers L. Rev. 378 (1958); and 4 Vill. L. Rev. 155 (1958). Furthermore, by express provision of the Act—§ 1(5) of the Labor Relations Act, 29 L.P.R.A. § 62(5)—collective agreements are instruments for the promotion of public policy, and, hence, any action which thwarts their negotiation in the long run only thwarts the effectuation of the public policy principally administered by the Commonwealth Labor Relations Board.

Lastly, it is necessary to point out that the alternative remedies provided, and which in a certain way tend to reflect in the efficiency of the Board, were not actually available. In the first place, it was not necessary to enforce judicially the order entered in case CA-2985 because evidently, as it appears from footnote 3, the employer complied with it. And in the second place, the time taken by the Board from the filing of the charge to the entry of its decision and order is reasonable considering the procedure provided in its regulations for cases of unfair practice. Rather, it may be said that all possible diligence was exercised under the circumstances.

3. In the report submitted by the Trial Examiner recommendation was made to the Board to incorporate in the cease and desist order directed to employer Ceide a warning to refrain from refusing to negotiate with the Union of Workers of Barrio Palmar, affiliated to the Union of Workers UPWA–AFL–CIO, "or with any other labor organization chosen by a majority of his employees in an appropriate unit for collective bargaining upon being required to do so," and further, not to interfere with, restrain, or coerce at all his employees in the exercise of the rights guaranteed to them by § 4 of the Act. Appellee did not file a statement in writing setting

forth exceptions to this report as required by § 11 of Regulation No. 2 of the Labor Relations Board, 29 R.&R.P.R. § 64–11. The final order entered by the Board included a cease and desist warning in the manner recommended by the Trial Examiner.

■ The employer-appellee contends that the evidence which the Examiner had under consideration does not warrant an order such as that recited, which restrains him not only as to refusing to negotiate collectively with the appropriate unit officially certified as the authorized representative of the laborers, but also in connection "with any other labor organization chosen by a majority of his employees," and which refers, without specifying, to the rights guaranteed to the employees by § 4 *supra*. Before discussing this assignment it is necessary to dispose of the Board's objection that the same is untenable, alleging that since this objection was not timely submitted to it, the express provisions of § 9 (2) (a), 29 L.P.R.A. § 70 (2) (a), bar consideration of the question at this stage of the proceedings. In fact, that section in its pertinent part provides that "no objection that has not been raised before the Board . . . shall be considered by the Court, unless the failure or neglect to raise such objection be excused because of extraordinary circumstances." Actually, it is the best practice for an agency to which the administration of a legislative policy is entrusted to have an opportunity to consider in the first instance all questions which may be raised on the correctness and validity of its orders and procedures. We have so reiterated it in similar situations. *Labor Relations Board* v. *I.L.A.*, 73 P.R.R. 568, 599 (1952); *Luce & Co.* v. *Labor Relations Board*, 71 P.R.R. 335, 344 (1950). However, we cannot agree that the bare fact of not raising the objections to the Examiner's report in due time before the Board deprives a party of its contention before this Court where, as in the present case,

the allegation is that the pronouncements complained of are not warranted by the evidence admitted, which constitutes the record which gave rise to the action of the Board. Actually, the failure to file a bill of exceptions to the Examiner's report has the effect, under § 11 of the Regulations, *supra*, of submitting the case to the Board on the basis of the record. But we do not interpret such inaction of a party in the sense that it accepts all the recommendations contained in the report. The Board is bound to determine whether they are proper, but it is under no obligation to accept invariably the officer's recommendations. *Rivera* v. *Labor Relations Board*, 70 P.R.R. 320 (1949).

It is of utmost importance to the party to whom a cease and desist order is directed to know specifically what conduct is restrained, since the violation thereof subjects him to punishment for contempt. *National Labor Rel. Bd.* v. *Express Pub. Co.*, 312 U.S. 426 (1941); *N.L.R.B.* v. *Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807 (7th Cir. 1962); *Canyon Corporation* v. *Nat. Labor Rel. Board*, 128 F.2d 953 (8th Cir. 1942). It may be asserted generally that the acts restrained must be supported by the evidence adduced on the facts constituting the unfair practices committed, *N.L.R.B.* v. *Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807, 810 (1962), and that the authority conferred on the Board to restrain unlawful practices is not an authority to restrain generally the conduct which has not been observed or which is not reasonably related to the proven unlawful acts, *Communications Workers* v. *N.L.R.B.*, 362 U.S. 479 (1960); *N.L.R.B.* v. *United Ass'n of Journeymen, etc., Local 469*, 300 F.2d 649 (9th Cir. 1962), unless from the unfair practices committed danger of the commission of like or similar violations in the future is to be anticipated, *National Labor Rel. Bd.* v. *Express Pub. Co.*, 312 U.S. 426 (1941). As stated in *N.L.R.B.* v. *International Longshoremen's & Ware. Union*, 283 F.2d 558, 568 (9th Cir. 1960), "a broad order will be

modified unless the evidence supports a proclivity for unlawful action or unless a finding relating to the likelihood of similar violations is made either by the Board or the Trial Examiner." *N.L.R.B.* v. *Miscellaneous Drivers and Helpers, Local 610*, 293 F.2d 437 (8th Cir. 1961); *N.L.R.B.* v. *Highway Truckdrivers & Helpers, Local No. 107*, 300 F.2d 317, 322 (3d Cir. 1962), point out that a broad order is permitted where the evidence shows the existence of a general scheme or course of conduct contemptuous of the legal provisions. See Linkoff, *The Courts and Administrative Agencies*, 29 Geo. L. Rev. 1026 (1941), and note in 59 Harv. L. Rev. 624 (1946), commenting *N.L.R.B.* v. *Sun Tent-Luebbert Co.*, 151 F.2d 483 (9th Cir. 1945). The employer's or union's past conduct is therefore a factor to be considered in passing upon the Board's justification to enter a broad and general order, *N.L.R.B.* v. *Local 294, Internat'l Bro. of Teamsters, etc.*, 298 F.2d 105, 108 (2d Cir. 1961); *N.L.R.B.* v. *Standard Metal Fabricating Co.*, 297 F.2d 365 (8th Cir. 1961); *N.L.R.B.* v. *Atlanta Coca Cola Bottling Company*, 293 F.2d 300 (5th Cir. 1961); *N.L.R.B.* v. *Lexington Electric Products Co.*, 283 F.2d 54 (3d Cir. 1960); *Precision Fabricators* v. *National Labor Relations Bd.*, 204 F.2d 567 (2d Cir. 1953); *National Labor Rel. Bd.* v. *Charles R. Krimm Lumber Co.*, 203 F.2d 194 (2d Cir. 1953); *National Labor Relations Board* v. *Globe Wireless*, 193 F.2d 748 (9th Cir. 1951).

■ The criteria set forth above to evaluate the propriety of a cease and desist order in broad and overall terms lead to the inevitable conclusion that the order of the Board directed to employer Ceide, insofar as it refers to the refusal to negotiate with the Union or with any other labor organization chosen by a majority of his employees, is fully justified. Not only is reference made in the Trial Examiner's report to the "founded fear that in the future the employer may repeat similar unfair labor practices," but his past conduct reveals clearly an attitude of open resistance to the obliga-

tion to bargain collectively with the certified representative of his workers to the point of pretending to ignore the contracting unit and attempting to deal individually with the laborers by resorting to means aimed at discouraging membership in the Union. *Cf. N.L.R.B.* v. *Katz,* 369 U.S. 736 (1962); *N.L.R.B.* v. *Crompton Mills,* 337 U.S. 217 (1949); Notes, 76 Harv. L. Rev. 210–14 (1962); 1961 Wis. L. Rev. 682. It is to be noted that in the short period of three years the Board has been compelled on two occasions to restrain the conduct of employer Ceide, and in both cases such conduct shows a designed and clear purpose to refuse to negotiate or to delay the negotiations, thereby giving occasion for the crop season period to elapse and placing the Union in a disadvantageous position in the process of collective bargaining. It is also significant that, as pointed out by the representative of the Union in the course of the hearing, Ceide's attitude is unique in the sugarcane region of Aguadilla.[9] If the employer's conduct is prompted by the purpose of discrediting and destroying the Union, the terms of the order of the Board constitute a timely warning that he will have, nonetheless, to negotiate with the representative unit of his workers. It is about time that the employer realizes that one of the fundamental purposes of the Labor Relations Act is to promote collective bargaining in that field.

We agree, however, that the cease and desist order of the Board as respects the interference with the exercise of the rights guaranteed to the employees by § 4 of the Act is too broad, since the evidence merely shows that the employer has interfered only with the right of his laborers to bargain collectively through the representative chosen by them. The

---

[9] ". . . is the only sugarcane plantation in this entire jurisdiction where the laborers do not have a collective agreement, and this is creating a serious problem to me here because of the fact that Ceide's farm lies in a centric place and is the only plantation which does not have a collective agreement."

quasi-restraining order need not extend to the other rights mentioned in that legal provision. *May Dept. Stores Co.* v. *National Lab. Rel. Bd.*, 326 U.S. 376, 392 (1945); *N.L.R.B.* v. *Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807 (1962); *National Labor Rel. Bd.* v. *Express Publishing Co.*, 312 U.S. 426 (1941). For an excellent analysis of the latter opinion in the light of the legislative history of the statute and of the supporting authorities, see Manoff & Schmiedigen, *The Express Publishing Co. Case*, 23 B.U.L. Rev. 447 (1943); and also notes in 41 Colum. L. Rev. 911 (1941), and 27 Va. L. Rev. 956 (1941).

■ 4. Lastly, employer Ceide complains that the Board unduly used its knowledge of the industrial reality—the determination that in the agricultural phase of the sugar industry collective agreements are frequently made retroactive to the commencement of the crop season—in order to decide which was the adequate remedy for the purpose of effectuating the purposes of the Act. The attorneys for the Board dispose of this objection as follows:

". . . We admit that defendant would be deprived of the due process of law should it be concluded that he has engaged in an unfair labor practice on the basis of adjudicative facts which he has not had an opportunity to controvert. However, the conclusion challenged was not used in the way of adjudicative facts but as legislative facts. See Kenneth Culp Davis, *Official Notice*, 62 Harv. L. Rev. 537, especially footnote 52, pp. 554-55.

"*According to Davis, what violates the due process of law is not that the agency resorts to extra-record facts but that it does not base its conclusions to enable the aggrieved party to challenge them.* In the case under consideration the aggrieved party challenges the use of a certain datum which is not included in the record, but it does not allege that such conclusion is erroneous."

The question is not, indeed, whether the findings of fact of the Board are not supported by the evidence, in which case we would not be precluded from intervening, *Labor*

*Relations Board* v. *Simmons Int'l Ltd.*, 78 P.R.R. 360, 370 (1955); *Rivera* v. *Labor Relations Board*, 70 P.R.R. 5, 8 (1949), since for the purpose of the bare conclusion that the employer has refused to negotiate and that he has interfered with the rights guaranteed to the workers, the fact that the agreements in the sugar industry are generally retroactive does not have special significance and is to a certain extent wholly irrelevant.

The order entered by the Labor Relations Board on June 13, 1962, will be enforced with the modifications referred to in the course of this opinion.[10]

Mr. Justice Santana Becerra delivered a separate vote in which Mr. Justice Hernández Matos concurred. Mr. Justice Belaval did not participate.

—O—

Separate opinion of Mr. Justice Santana Becerra.

San Juan, Puerto Rico, December 20, 1963

Even though the opinion of the Court analyzes and characterizes the provision of the decision of the Board relative to the retroactive effect of the collective bargaining thereunder, I wish to stress the fact that the Labor Relations Board is without power in law to direct that the collective bargaining contracts and agreements which it orders to be carried out shall have retroactive effect in any case, not even in the belief that there exist special circumstances as it believed existed in the case at bar.

---

[10] The aspect of the order to negotiate included in the affirmative action required shall read as follows:

"(a) To bargain collectively with the Union of Workers of Barrio Palmar, affiliated with the Union of Workers UPWA–AFL–CIO, as exclusive representative of the workers employed in the planting, cultivation, cutting and harvesting of sugarcane on his Victoria and Carrizales farms.

"(b) To negotiate collectively also with the Union of Workers of Bo. Palmar, affiliated with the Union of Workers UPWA–AFL–CIO, as exclusive representative of the employees employed in the planting, cultiva-

A Union representative of his employees filed a charge against this employer for refusing to negotiate a collective agreement. The refusal to bargain collectively constitutes an unfair labor practice. Labor Relations Act, No. 130 of 1945, § 8(1)(d). The corresponding complaint having been filed and the required procedures provided, the Labor Relations Board entered its decision and order directing this employer to cease and desist from refusing to bargain collectively with the Union or with any other labor organization chosen by a majority of his employees as collective bargaining unit. As affirmative action, it also ordered the employer to bargain collectively in the following terms:

"To bargain collectively with the Union of Workers of Barrio Palmar, affiliated with the Union of Workers UPWA–AFL–CIO, as exclusive representative of the workers employed in the planting, cultivation, cutting and harvesting of sugarcane on his Victoria and Carrizales farms; PROVIDED, that the collective agreement which may be signed, if any, *shall be made retroactive* to the commencement of the employer's work for the 1962 crop season." (Italics ours.)

The order is dated June 13, 1962.

In the course of its decision the Board stated as follows:

"Considering that employer Abelardo Ceide conscientiously refused for the second time[1] to bargain with the exclusive representative of his employees, thereby depriving them of the benefits of collective bargaining during the 1962 crop season, we believe that, the best way to effectuate the purposes of the Act and to repair the damage done is by giving retroactive effect to the collective agreement which may be signed, if any, pursuant to the terms hereof.

"We believe that the unfair practice committed will thereby be efficiently cured, since in refusing to negotiate the employer prevented the representative of his employees from obtaining a retroactive clause, as is usually the case in the agricultural phase of the sugar industry.

---

tion, cutting and harvesting of sugarcane on his Victoria and Carrizales farms for the 1962 and 1963 crop seasons."

"Although in this particular case compliance with this new order of the Board could be considered in practice as a sort of sanction or penalty imposed upon the employer for the purpose of repairing the damage caused to the workers by refusing to negotiate with their collective representative—which we condemn personally—we have been prompted to adopt the same by a desire to remedy or prevent hereafter, particularly in the sugar industry in which the crop season is so short, that owing to mere technicalities or subterfuges, as has been established, the employer may delay the commencement of the negotiation to the extent of rendering it ineffective by merely waiting for the season to terminate, or sitting down to negotiate when the season is about to end." [1] Abelardo Ceide, case No. CA-2185, D-208.

The parties have discussed fully whether or not the decision, with its retroactivity provision, has a punitive character. The Solicitor General in his brief in representation of the Board admits that the lawmaker did not authorize the imposition of penalties or sanctions in § 9 (1) (b) of the Act. That section authorizes the Board to take affirmative action in order to effectuate the purposes of the statute. It seems to be well settled under the federal legislation, the pattern of ours, that the National Board has no punitive powers. *Cf. Rivera* v. *Labor Relations Board,* 70 P.R.R. 5 (1949).

Regarding the argument of the adverse party that the National Labor Relations Board has never entered an order of this nature containing a retroactivity clause, he comments: "The fact that the National Labor Relations Board has not entered an order such as that challenged does not show that this order is illegal. It merely shows that the petitioner [the Board] is exploring new avenues in the light of the industrial reality proper of Puerto Rico."

Although the parties have placed emphasis on the nature of the order as to whether it is of a "punitive" or "remedial" character, I do not believe that the fact itself of the characterization has great importance. Considering the same of a "remedial" character and, therefore, permissible in that

sense under the statutory provisions and the doctrine, the problem, in my opinion, is a more fundamental one which goes deep as a question of public policy in the field of labor-management relations.

There is no question that the Board has sufficient powers to compel the parties to bargain collectively, since the obstinacy to do so constitutes an unfair labor practice. It may exercise any affirmative action which may be proper and advisable in order to compel the parties to sit down to bargain, and it has available the coercive power of this Court to enforce its orders in that sense.[1]

---

[1] The following cases offer some illustrations of types of affirmative action of the Board in its function of compelling compliance with the purposes of the statute, apart from those specifically enumerated in the Act. Cf. *National Labor Relations Board* v. *Suburban Lumber Co.*, 121 F.2d 829, cert. denied, 314 U.S. 693; *National Labor Relations Board* v. *Ford Motor Co.*, 119 F.2d 326; *National Labor Relations Board* v. *Greenebaum T. Co.*, 110 F.2d 984, cert. denied, 311 U.S. 662; *National Labor Relations Board* v. *Carlisle Lumber Co.*, 94 F.2d 138, cert. denied, 304 U.S. 575, and the same case in 99 F.2d 533, cert. denied, 306 U.S. 646; *N.L.R.B.* v. *Remington Rand, Inc.*, 94 F.2d 862, cert. denied, 304 U.S. 576; *I. A. of M.* v. *Labor Board*, 311 U.S. 72; *Labor Board* v. *Newport News Co.*, 308 U.S. 241; *National Labor Relations Board* v. *Pennsylvania Greyhound Lines*, 303 U.S. 261; *Edison Co.* v. *Labor Board*, 305 U.S. 197, it was said that the affirmative action of the Board did not confer punitive jurisdiction to it, even though the Board believes that the purposes of the statute are better served by such order; *Labor Board* v. *Fansteel Corp.*, 306 U.S. 240, 257—the authority to require affirmative action of the Board is broad, but it is not unlimited; it has the essential limitations which inhere in the very policies which the Board invokes; *N.L.R.B.* v. *Dallas General Drivers, etc.*, 228 F.2d 702—the power of the Board and of the courts to *interpret* a collective agreement is upheld, but not to *dictate* the collective bargaining agreements; *Singer Mfg. Co.* v. *N.L.R.B.*, 119 F.2d 131, cert. denied, 313 U.S. 595—the Board may direct what the statute commands—to bargain in good faith—but it cannot dictate the terms of the agreement; *N.L.R.B.* v. *Cape Co. Milling Co.*, 140 F.2d 543, 546; *N.L.R.B.* v. *Colten*, 105 F.2d 179, 182; *N.L.R.B.* v. *Nash-Finch Co.*, 211 F.2d 622, 627.—It is clear that the Board may not, directly or indirectly compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements. Whether the contract should have contained the clause proposed by the Union, was an issue for determination across the bargaining table, not by the Board; *Cone Brothers Contract Co.* v. *N.L.R.B.*, 235 F.2d 37, 41, cert. denied, 352 U.S. 916; *Terminal Ass'n* v. *Trainmen*, 318 U.S. 1, 6.—The Railway Labor Act, like the *National*

But aside from compelling the parties to sit down to bargain—and to bargain in good faith—the Board has no powers to interfere with the collective bargaining itself, nor power in law to cause to produce a collective agreement. An order of the Board directing the parties to bargain collectively and that "the collective agreement *which may be signed,* if any, *be made* retroactive to the commencement," etc., constitutes in my opinion an unauthorized interference in the collective bargaining itself. Actually the Board sits down as a third party at the bargaining table. This, in my opinion, distorts and destroys the very nature of the collective bargaining which rests on the essential freedom of the employer and laborer to establish by mutual agreement the labor conditions. It involves, in my opinion, an interference by the State into the substance of collective bargaining through one of its agencies.

If the Board had power under the law to cause to produce a collective agreement, and if this Court had it in its function to enforce the orders of the Board, perhaps it could be argued that the power to order that retroactive effect be given to an agreement could be a logical by-product of the power to cause to produce an agreement. However, the Board has no such power to cause to produce an agreement.

In my opinion, the retroactivity of the product of the agreement constitutes, par excellence, the laborer's bargaining and defense instrument at the bargaining table, in ex-

---

*Labor Relations Act,* does not undertake governmental regulation of wages, hours, or working conditions; it seeks to provide a means by which agreement may be reached with respect to them; *Labor Board* v. *Insurance Agents,* 361 U.S. 477.—The negotiation of labor agreements is neither for the Board nor for the courts; *N.L.R.B.* v. *Herman Sausage Co.,* 275 F.2d 229; *Labor Board* v. *Borg-Warner Corp.,* 356 U.S. 342, where, notwithstanding the opinion of the Court does not show that the Board attempted to interfere with the substantive part of the negotiation, even so Justices Harlan, Clark and Whittaker expressed their fear that the decision could open the door to an intrusion by the Board into substantive aspects of the bargaining process, which goes beyond anything contemplated by the Labor Relations Act.

change for which he may obtain other favorable concessions, and it is also one of the means mostly called upon to avert forthwith a strike or stoppage of the activities.

Within the limited range of this specific matter, *such as this case*, I do not question the Board's good intention to wish to protect the employee. However, viewing the question in its broad projections in the light of the labor policy and of the philosophy of completely free collective bargaining, the precedent laid down in the long run works more evil than good. Even in the specific case under consideration it will render more difficult the production of an agreement, even though the parties sit down to negotiate in good faith.[2]

The situation in these cases is simply but very objectively portrayed in the following concepts which form part of the legislative history of this legislation stated by Senator Walsh, Chairman of the Senate Education and Labor Committee, on the Wagner Act, and which I take the liberty to reproduce here from the brief of the amici curiae, who argue against the retroactive provision of the order:

"The bill indicates the method and manner in which employees may organize the method and manner of selecting their representatives or spokesmen, and leads them to the office door of their employer with the legal authority to negotiate for their fellow employees. *The bill does not go beyond the office door*. It leaves the discussion between the employer and the employee, and the agreements which they may or may not make, voluntary and with that sacredness and solemnity to a voluntary agreement with which both parties to an agreement should be enshrouded." (Italics ours.)

The Board explains its action as a more effective means of enforcing its decision. The danger lies in that, after the essence of the absolute freedom of the parties as to the substantive aspect of the negotiation is destroyed and the States'

---

[2] The proposed collective agreement is not limited only to the fixing of salaries. It contains all the typical clauses already known of such agreements.

interference comes into play, the determination as to when the Board is justified in interfering will depend on its own criterion, which it will justify whenever it honestly believes that by doing so its decisions will be more effective. The danger to me is clear, apart from the fact that in my opinion that is not the law.

If the decision of the Board in this case is enforced, it would eliminate the "Provided" clause of the Board ordering that any agreement which may be signed shall be retroactive.

Mr. Justice Hernández Matos has authorized me to say that he concurs in this separate opinion.